# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2411

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Calvin James, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 13, 2008
Filed: July 24, 2008

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Calvin James was indicted on one count of bank robbery, in violation of 18 U.S.C. § 2113(a). James filed a pretrial motion to suppress and an amended motion to suppress evidence recovered during police searches of two motel rooms and his person. The district court[1] denied the motions. After trial, a jury convicted James of the bank robbery. James moved for a new trial, renewing his challenge to the use of

_____

[1]The Honorable Patrick J. Schlitz, United States District Judge for the District of Minnesota, denied the pretrial motions to suppress.

evidence obtained from the searches. The district court[2] denied the motion and sentenced James to 210 months' imprisonment. James now appeals the district court's admission of evidence obtained from the motel rooms. We hold that no Fourth Amendment violation occurred and affirm.

## I. *Background*

On July 23, 2006, a TCF Bank in Minneapolis was robbed. The bank robber escaped with a bag of cash, but the teller had secretly placed a dye pack—which was designed to explode and stain the money with dye—in with the money. Witnesses described the bank robber as a black male, approximately five feet eleven inches tall, weighing about 185 pounds, and believed to be in his 20's to 30's. The robber was also captured on the bank's video surveillance cameras.

On July 31, 2006, FBI Special Agent Benjamin Hruz received a phone call from St. Paul Police Officer Sheila Lambie. Officer Lambie told Agent Hruz that a reliable confidential informant (CI) had told her that a man named Calvin James was in possession of red dye-stained money and that James was in a motel room at the Xcel Inn in St. Paul. Upon investigating the name "Calvin James," Agent Hruz learned that the FBI had an open file on James for a previous bank robbery conviction. Agent Hruz compared James's previous booking photograph with images from the bank's surveillance cameras and concluded that the subjects in the two photos generally matched, providing Agent Hruz with sufficient information to investigate James as a suspect in the July 23rd bank robbery. Agent Hruz arranged to meet with Officer Lambie to discuss and plan the investigation of James.

Unbeknownst to Agent Hruz, and unrelated to the bank robbery investigation, around 9:00 a.m. on July 31, 2006, the St. Paul Police received a report of an assault

---

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota, presided over James's trial and sentencing.

at the Xcel Inn in St. Paul. Officer Murray Prust responded to the call. Dispatch informed Officer Prust that a female in the motel's lobby claimed to have been assaulted and that the suspect fled the scene. As Officer Prust drove towards the motel, he recognized the motel's manager two blocks from the motel at a gas station. Knowing that another police unit was on its way to the motel, Officer Prust stopped at the gas station to talk with the motel manager. The motel manager, obviously out of breath, told Officer Prust that he had chased the fleeing assault suspect but had lost sight of him. The manager speculated that the suspect boarded a city bus near the gas station.

Officer Prust then proceeded to the Xcel Inn where he found the female victim inside the manager's office. The victim was crying, had difficulty breathing, and had visible marks on her head that could have been injuries from the alleged assault. The victim told Officer Prust that she had been in Room 322 of the motel with Calvin James and that she and James had packed their belongings and were leaving the motel when James assaulted her. The victim told Officer Prust that after the assault, James "fled with all his stuff" and that she went to the motel's lobby. The manager of the motel produced a photograph of the person registered to Room 322 and told Officer Prust that the registrant's name was Calvin James. The manager also informed Officer Prust that James had made payment on the room through that day and that he believed James was supposed to check out by noon that day.

After paramedics transported the victim to the hospital, Officer Prust and the manager went to Room 322, where the manager used his key-card to gain entry into the room. Officer Prust entered the room to look for any evidence that would corroborate the victim's account of the assault. Once inside, Officer Prust only conducted a visual inspection of the room, not a full search—he did not open any drawers or closets, and did not attempt to process the scene. Officer Prust noticed drug paraphernalia but no other personal items in the room. He also noticed that all of the

-3-

trash from the room had been packed inside the room's trash cans. Based upon his observations and experiences, Officer Prust concluded that Room 322 was vacant.

After instructing an officer to guard Room 322, Officer Prust left the motel and went to the hospital to check on the victim. While talking to the victim, Officer Prust learned that the victim had been held against her will by James for several days and that James had sexually assaulted her. The victim also told Officer Prust that James had a large amount of cash while at the room, that the money was in a black bag, and that the money had red stains on it. Officer Prust then left the hospital, went to the police station to pick up the supplies necessary to process Room 322 and returned to the motel room, arriving shortly after 11:00 a.m. The officer who had been guarding Room 322 informed Prust that no one had come to claim Room 322.

As Officer Prust began processing the room for evidence of a sexual assault, he went through the contents of the trash can and noticed cut pieces of U.S. currency with red dye stains on them. Officer Prust also noticed towels with faded red dye on them and a piece of cardboard with a large red dye stain on it. This was the first time Officer Prust had noticed any red dye stains in the room. Officer Prust suspected that the red dye stains might have come from an exploded dye pack and placed a phone call to the FBI. Officer Prust spoke to Agent Hruz and told him about the pieces of dye-stained money he had found during the sexual assault investigation at the Xcel Inn, and Agent Hruz informed Prust that James was being investigated as a suspect in the July 23rd robbery of TCF Bank. Agent Hruz informed Officer Prust to contact Sergeant Kevin Moore of the St. Paul Police Department's Special Investigation Unit, as the FBI had already established contact with the Sergeant. When Officer Prust contacted Sergeant Moore, he instructed Prust to stop processing the Xcel Inn scene and wait for the arrival of the FBI. Officer Prust then stopped all activity in Room 322 until the FBI arrived.

Agent Hruz met Officer Prust at Room 322 and "froze" (restricted access to) the room until a search warrant was obtained. Based upon information provided by Agent Hruz, a Minneapolis Police Department sergeant who was also investigating the TCF Bank robbery obtained a state search warrant for Xcel Room 322. Agent Hruz observed the search of Room 322 conducted by the St. Paul police department. During the search, Agent Hruz left to follow up a tip about James's location. At no point during the execution of the search warrant did James or anyone else return to Room 322 or attempt to stop the search.

Later that day, Officer Lambie received information that James had checked into a room at the Economy Inn. Officer Lambie and another officer went to the Economy Inn and confirmed with a hotel clerk that James was registered to Room 419. Then they set up surveillance in a room diagonally across from Room 419. Several other officers, including Agent Hruz, also participated in the surveillance and were positioned in various locations in and around the motel. After observing James leave Room 419 and walk into the manager's office, and confirming that James was the same person who had rented Room 419, the officers arrested James as he exited an elevator. The officers searched James and found red dye-stained money on his person.

Following the search of James, Agent Hruz and other officers entered Room 419 to conduct a security sweep of the room. During the security sweep, Agent Hruz saw more red dye-stained money in plain-view inside the room. Agent Hruz then "froze" the scene and sought a search warrant for the room. The FBI obtained a federal search warrant for Room 419, and the search warrant was executed that same evening. The warrant-authorized search uncovered a black bag containing various red dye-stained items including clothing, additional money, and a receipt from the Xcel Inn.

Thereafter, James was indicted on one count of bank robbery, in violation of 18 U.S.C. § 2113(a). James moved to suppress all items recovered from the search of

Room 322 of the Xcel Inn, Room 419 of the Economy Inn, and his person. The district court denied James's motions to suppress, and he was subsequently found guilty of bank robbery by a jury. After denying James's motion for new trial, which renewed his challenge to the use of evidence obtained as a result of the searches, James was sentenced to 210 months' imprisonment.

## II. *Discussion*

On appeal, James argues that the evidence recovered from inside the two motel rooms should have been suppressed as the searches were unreasonable in violation of the Fourth Amendment. He seeks a new trial without the improperly admitted evidence. We will address each search in turn.

## A. *Search of Xcel Inn Room 322*

James contends that the search of Xcel Inn Room 322 was unreasonable in violation of the Fourth Amendment because Officer Prust entered the room twice and conducted a warrantless search. James contends he maintained an expectation of privacy in Room 322 despite his absence. When moving to suppress evidence on the basis of an alleged unreasonable search, the defendant "has the burden of showing a legitimate expectation of privacy in the area searched." *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000). "Whether a defendant has a constitutionally protected expectation of privacy involves a two-part inquiry"—the defendant must show that (1) he "has a reasonable expectation of privacy in the areas searched or the items seized," and (2) "society is prepared to accept the expectation of privacy as objectively reasonable." *United States v. Hoey*, 983 F.2d 890, 892 (8th Cir. 1993). In this case, the district court denied James's motion to suppress the evidence from Room 322, concluding that James had abandoned the room prior to any entrance or search of the room by law enforcement, and thus, he lacked any expectation of privacy in the room at the time of the entries or searches.

"It is well established that the warrantless search of abandoned property does not constitute an unreasonable search and does not violate the Fourth Amendment." *Id.* A district court's determination of abandonment is reviewed for clear error. *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997). Thus, "we must affirm the district court's abandonment finding unless its decision is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." *Id.* (internal quotations and citations omitted).

We thoroughly discussed the issue of abandonment in *Tugwell*, stating:

A warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in the item searched is forfeited upon its abandonment. *United States v. Segars*, 31 F.3d 655, 658 (8th Cir. 1994). The issue "is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished h[is] reasonable expectation of privacy so that the search and seizure is valid." *United States v. Hoey*, 983 F.2d 890, 892–93 (8th Cir. 1993) (other citations omitted). Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent. *See United States v. Rem*, 984 F.2d 806, 810 (7th Cir. 1993). "This determination is to be made in light of the totality of circumstances, and two important factors are denial of ownership and physical relinquishment of the property." *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). We consider only the information available to the officers at the time of the search. *See Rem*, 984 F.2d at 811 ("In order to determine whether a pre-search abandonment has occurred, the flow of information considered stops at the moment the police officer opened the suitcase").

*Tugwell*, 125 F.3d at 602.

Following this precedent, we must examine the objective facts available to Officer Prust at the time he entered Room 322 at the Xcel Inn. Officer Prust knew that: (1) an assault had been reported by a female victim; (2) the alleged victim stated that she had been attacked by Calvin James; (3) the victim stated that James attacked her after the two had packed their bags in preparation for leaving the motel; (4) the victim reported that James fled with all his belongings after the assault; (5) the motel manager reported that the alleged attacker fled the motel and that he chased the suspect for a couple of blocks before losing sight of him near a city bus; and (6) the motel manager told Officer Prust that James had rented Room 322 but that he was scheduled to leave that day. Given these objective facts, it was not clear error for the district court to find that James had abandoned Room 322 before Officer Prust's initial entry into the room.

Moreover, Officer Prust's initial entry into Room 322 uncovered no evidence. This entry, in fact, only produced information consistent with abandonment. Officer Prust saw that the room contained no personal belongings and that all of the occupants' debris had been placed into the room's trash can. Given these additional objective facts supporting abandonment and the lack of anyone claiming occupancy to the room at any time prior to the second entry, substantial evidence supported a finding of abandonment prior to the second warrantless entry into the room. *See United States v. Caballero-Chavez*, 260 F.3d 863, 867–68 (8th Cir. 2001) (concluding that defendants' abandonment of motel room and its contents was a voluntary act untainted by officers' prior search of room and contents, such that defendants had no interest justifying suppression of evidence discovered in room). Thus, James had "relinquished h[is] reasonable expectation of privacy" in the room prior to the warrantless search of the room, and therefore the search did not implicate his Fourth Amendment rights. *Tugwell*, 125 F.3d at 602 ("A warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in

the item searched is forfeited upon its abandonment").[3] Accordingly, the district court did not clearly err in finding that James abandoned Room 322 prior to any search of the room, and the evidence subsequently seized from the room pursuant to the search warrant was not tainted.

## B. *Search of Economy Inn Room 419*

Police arrested and searched James outside an elevator at the Economy Inn. James had dye-stained money in his possession. Law enforcement officers then entered James's room at the Economy Inn, without a warrant, to conduct a protective sweep of the room to make sure no one else was inside. During the protective sweep, additional dye-stained money was observed in plain-view. Once the protective sweep

---

[3]Even if the district court clearly erred in finding that James had abandoned room 322, the evidence recovered from the room would nevertheless have been admissible under the inevitable discovery doctrine because the FBI had already learned, from an unrelated, independent investigation, that James was a suspect in the bank robbery, had dye-stained money, and was staying in that motel room. *See United States v. Alvarez-Gonzalez*, 319 F.3d 1070, 1072 (8th Cir. 2003) ("For the inevitable discovery doctrine to apply, there must have been a reasonable probability the evidence would have been discovered in the absence of police misconduct, and the police must have been purs[u]ing a substantial, alternative line of investigation"). Agent Hruz testified that even without receiving any information from Officer Prust, he would have followed up on his investigation and pursued a search warrant for Room 322. Prior to Officer Prust calling Agent Hruz about his findings of dye-stained money in Room 322, Agent Hruz was already aware that: (1) a TCF Bank had been robbed on July 23, 2006; (2) the robber was captured by the bank's security cameras; (3) the robbery suspect in the bank security videos generally matched the booking photo of James on file with the FBI from a previous bank robbery conviction; (4) a confidential informant had identified James as being in possession of dye-stained money; and (5) the informant stated that James was staying at the Xcel Inn. Thus, prior to receiving any information from Officer Prust, Agent Hruz had an independent basis to apply for a search warrant for the motel room, had probable cause to do so, and testified that he would have done so. Therefore, the evidence discovered during Officer Prust's warrantless search of the Xcel motel room would have been inevitably discovered from an independent investigation.

was completed, the officers froze the room and applied for a search warrant. The officer's search warrant affidavit listed the evidence linking James to the bank robbery, including, among other things, the evidence seized pursuant to the search warrant from Xcel Room 322 and the dye-stained money seized from James's person. Additionally, the affidavit mentioned that officers had seen, in plain-view, dye-stained money inside Economy Inn Room 419, as they conducted a security sweep of the room following James's arrest. The search warrant was issued and a search pursuant to that warrant was conducted, with officers seizing additional dye-stained money, dye-stained clothing, a receipt from the Xcel Inn, and other dye-stained items inside a black bag.

Below, James relied exclusively on an argument that any search, with or without a warrant, of Room 419 was tainted by the invalidity of the initial warrantless search of his Xcel Room 322.[4] As previously discussed, however, the evidence seized from Room 322 of the Xcel Inn was not tainted because James abandoned the room prior to its search. Thus, the search of Economy Inn Room 419 is not unreasonable on that basis.

Additionally, James's brief to this court also raised—for the first time—an issue regarding the warrantless "protective sweep" entry into Room 419 following James's arrest which occurred in a common area outside of Room 419.[5] Because James did not

---

[4]*See* James's Motion to Suppress Evidence from Search, Amended Motion to Suppress Evidence from Search, Memorandum in Support of Motion to Suppress Evidence Obtained as a Result of Search and Seizure, the Magistrate's Report and Recommendation, James's Objections to the Report and Recommendation, and the District Court's Order Adopting Report and Recommendation.

[5]James's entire "analysis" of the warrantless entry of Room 419 consisted of two sentences in his initial brief to this court. Without citing any authority for his position, the brief stated:

raise this issue in his suppression motion below, neither the Magistrate's report and recommendation, nor the district court's order adopting the report and recommendation and denying the motion addressed the issue.

Our court has "'not yet decided whether the failure to raise a suppression matter in a timely pretrial motion precludes plain error review.'" *United States v. Cardenas-Celestino*, 510 F.3d 830, 833 (8th Cir. 2008) (quoting *United States v. Eagle*, 498 F.3d 885, 892 (8th Cir. 2007)). Assuming without deciding, however, that plain error review would be available, we decline to review James's challenge to the seizure of evidence in Room 419 for plain error as James has offered neither convincing argument nor authority in support. *See Watson v. O'Neill*, 365 F.3d 609, 615 (8th Cir. 2004) ("Allegations of error not accompanied by convincing argument and citation to authority need not be addressed on appeal. As a result, we regularly decline to consider cursory or summary arguments that are unsupported by citations to legal authorities.") (internal citation omitted).

III. *Conclusion*

Accordingly, we affirm the judgment of the district court in all respects.

_____

_____

Even if the application for the search warrant for the Economy Inn contains sufficient allegation to support probable cause after references to the tainted evidence from the Excel [sic] Inn is redacted, the subsequent warrant does not retroactively purge the fact that the evidence at the Economy Inn was effectively seized when police entered Room 419 before obtaining the warrant and found the evidence which was later purportedly "seized" pursuant to the warrant.

All evidence and the attendant "knowledge" or intelligence obtained by law enforcement as a result of these warrantless searches should have been suppressed.

Appellant's Brief at 20.

-11-