# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-1407

_____

Jelitha McKenney, Individually and as
Special Administrator of the Estate of
James C. Barnes, Deceased,

       Appellant,

    v.

Lance Harrison, Officer, individually
and in their respective capacities as
officers of the Omaha, Nebraska Police
Department; Dawn Pollreis, Officer,
individually and in their respective
capacities as officers of the Omaha,
Nebraska Police Department; City of
Omaha, Nebraska,

       Appellees.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States
District Court for the
District of Nebraska.

_____

Submitted: December 14, 2010
Filed: March 28, 2011

_____

Before WOLLMAN, MURPHY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

     James C. Barnes died as a result of injuries he suffered during an encounter
with Omaha, Nebraska, police officers Lance Harrison and Dawn Pollreis. Jelitha

McKenney, on her own behalf and as special administrator of Barnes's estate, brought this action against Harrison and Pollreis in their individual and official capacities, and against the City of Omaha. The district court[1] granted summary judgment for Harrison, Pollreis, and the City. McKenney appeals, and we affirm.

I.

We recount the facts in the light most favorable to McKenney, the nonmoving party. On July 31, 2007, Harrison obtained from the city prosecutor's office three warrants for Barnes's arrest. The warrants declared that Barnes was subject to arrest for several misdemeanors: operating a motor vehicle to avoid arrest, driving with a suspended driver's license, driving recklessly, and failing to appear. They also provided an address of 2860 Manderson Street as Barnes's residence; this was the location of a house owned by Barnes's grandfather. Harrison went to the house to execute the warrants on July 31.

Harrison had encountered Barnes once before, when Harrison stopped a vehicle Barnes was driving earlier that month. Harrison told Barnes to get out of his car, but Barnes did not comply, instead fleeing in his vehicle. Police later discovered Barnes's vehicle not far from the Manderson Street address. Harrison found Barnes's state identification card in the vehicle. The address on the card was the same as the address on the arrest warrants.

While en route to Manderson Street, Harrison requested by radio that another officer assist him in executing the warrants, and Pollreis agreed to do so. Pollreis had never met Barnes, so when the officers arrived at the house, Harrison described Barnes to Pollreis. He also told her about Barnes's flight from the traffic stop.

---

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

The officers found the house in a state of disrepair. Harrison knocked at the front door, but no one answered. Pollreis found that the back door was open. Through the open door, Harrison and Pollreis could see into the kitchen. The room was dark and dirty, the refrigerator and cabinets were open and empty, there was trash on the floor, and no personal effects were visible. Based on the state of the house, Harrison and Pollreis concluded that it was abandoned. Harrison stated that they entered for two purposes: to check for squatters, and to investigate whether Barnes was there. They did not announce their presence when they entered.

Inside, the officers found no furniture or other signs that anyone lived there. When they approached a flight of stairs, however, they heard a fan running on the second floor. The officers proceeded up the stairs to investigate the sound. They found a woman in a bedroom and Barnes in a bathroom; neither was clothed. After the woman finished dressing, Harrison ordered Barnes to move to the bedroom, and Pollreis ordered Barnes to dress himself.

While Barnes was getting dressed, Harrison stood between Barnes and the bedroom's only doorway. Pollreis stood between Barnes and the room's two windows, one of which was covered with a picture and one of which was uncovered. Below the windows was the roof of an enclosed porch. Barnes was six to eight feet from the windows as he was dressing. The officers noticed that Barnes was looking around nervously and glancing at the windows. Harrison told Barnes not to do anything stupid. Pollreis, who had removed her Taser from its holster, told Barnes not to try anything and said "you don't want to be tased."

While Barnes was putting on his second shoe, he suddenly lunged toward the window. When he did so, Harrison immediately turned and ran down the stairs, anticipating that he would have to chase Barnes once he got out the window and down off the roof of the porch. Pollreis deployed her Taser as Barnes was passing

-3-

her but before he reached the window. The Taser's two probes lodged in Barnes's back, but Barnes continued through the window.

When Harrison came out the front door, he found Barnes lying on the sidewalk, conscious but injured. Neither he nor Pollreis saw how Barnes had left the roof. Harrison called a rescue squad, which brought Barnes to the hospital. Barnes died from his injuries four days later.

McKenney, Barnes's mother and special administrator of his estate, sued Harrison, Pollreis, and the City of Omaha under 42 U.S.C. § 1983 and the Nebraska Political Subdivisions Tort Claims Act. She raised four claims that are at issue on appeal: (1) that the officers' entry into the house violated the Fourth Amendment, (2) that the use of the Taser was excessive force in violation of the Fourth Amendment, (3) that the officers' conduct constituted actionable negligence under state law, and (4) that the City failed adequately to train and supervise the officers in the use of their Tasers and failed to develop and implement adequate policies governing the use of Tasers. The district court granted the defendants' motion for summary judgment.

II.

We review *de novo* the district court's order granting summary judgment, viewing the evidence in the light most favorable to McKenney and drawing all reasonable inferences in her favor. *Schoelch v. Mitchell*, 625 F.3d 1041, 1045-46 (8th Cir. 2010). Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A.

McKenney first contends that a genuine issue of fact precludes a finding that the officers are entitled to qualified immunity against her unlawful entry claim. Qualified immunity shields government officials from liability for civil damages and the burdens of litigation "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An official is entitled to qualified immunity against a § 1983 action unless (1) the facts, construed in the light most favorable to the party seeking damages, establish a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation. *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009). McKenney argues that the officers violated Barnes's clearly established right to be free from an unreasonable search when they entered the house without first knocking and announcing their presence, *see Wilson v. Arkansas*, 514 U.S. 927, 934 (1995), and without a reasonable belief that Barnes was present. *See Ward v. Moore*, 414 F.3d 968, 971 (8th Cir. 2005).

We conclude that the entry into the home did not violate Barnes's clearly established constitutional rights. It was reasonable for the officers to believe that their obligation to knock and announce their presence, or to ascertain the arrestee's presence, does not apply to an abandoned property. A search of abandoned property "does not implicate the Fourth Amendment, for any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. James*, 534 F.3d 868, 873 (8th Cir. 2008) (internal quotation omitted). Even though it turned out that Barnes had not actually abandoned the house, officers do not violate the Fourth Amendment if they act upon a mistake of fact that is objectively reasonable, *see Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990); *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005), and they are also entitled to qualified immunity if a mistake

-5-

about abandonment was objectively reasonable. *Anderson v. Creighton*, 483 U.S. 635, 643-44 (1987).

The totality of the circumstances supported an objectively reasonable belief by the officers that the house was abandoned. The officers found the house in disrepair, with an unkempt yard and a fence that was incomplete and falling apart. There were no vehicles parked in the driveway. No one responded when the officers knocked on the front door, and the back door was open three or four inches. Through the open door, the officers could see into the kitchen, where the cabinets were open and empty, the refrigerator was open, empty, and pulled away from the wall, and there was no furniture or personal effects. There were no lights on, sounds from appliances, or other indications that the house had electrical power. In light of these facts, it was reasonable for Harrison and Pollreis to conclude that the house was abandoned.

McKenney argues that the officers searched unreasonably, because Harrison admitted that they entered not only to look for squatters in an abandoned house, but also to determine whether Barnes was present. Fourth Amendment analysis, however, turns on what a reasonable officer could have believed under the circumstances, not on the state of mind or subjective beliefs of these particular officers. *See Scott v. United States*, 436 U.S. 128, 138 (1978); *United States v. Janis*, 387 F.3d 682, 688 (8th Cir. 2004). McKenney also argues that even if the officers could reasonably have believed that the house was abandoned at the time they entered, they should have known otherwise when they heard the fan upstairs. But because a reasonable officer could have concluded that the house was abandoned, a reasonable officer also could have concluded that anyone in the house was a trespasser who has no privacy interest under the Fourth Amendment. *See United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998). We therefore conclude that the entry did not violate Barnes's clearly established constitutional rights.

B.

McKenney next argues that she is entitled to a trial to determine whether the force used by the officers was excessive. Claims of excessive force are evaluated under the reasonableness standard of the Fourth Amendment. *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). "Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotation omitted).

We determine whether a use of force was reasonable by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation omitted). In so doing, we give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* We may also consider the result of the force. *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004).

McKenney argues that the force used was excessive under the circumstances. She highlights that the arrest warrants were based on minor offenses, that Barnes never threatened the officers, that the officers had no reason to believe that Barnes had a weapon, and that the result of the force was Barnes's death. She also observes that when Pollreis deployed her Taser against Barnes he was moving rapidly toward a second-story window. She further suggests that a rational jury could find that the officers failed to follow Omaha Police Department procedures in two respects. She argues that Pollreis violated a requirement that an officer, where feasible, call out "Taser" before deploying a Taser. And she contends that the officers contravened a rule forbidding deployment of a Taser against someone in an "elevated position."

-7-

We must judge the reasonableness of the force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and we must make "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. When Barnes made a sudden movement toward the window, which the officers reasonably interpreted as an active attempt to evade arrest by flight, the officers were entitled to use force to prevent Barnes's escape and effect the arrest. *See Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994). Although the charges were limited to misdemeanors, the officers executing the warrant were not required to let Barnes run free.

Despite the fatal consequences of the incident, the level of force employed also was not unreasonable. Pollreis used only a single Taser shock. She was required to react in a split second as Barnes sought to escape through a window only six to eight feet away. The alternative of attempting to subdue Barnes by tackling him posed a risk to the safety of the officer and did not ensure a successful arrest. The officers had warned Barnes. Just before he lunged, Harrison told Barnes not to do anything stupid, and Pollreis said "you don't want to be tased." And although the outcome was tragic, a reasonable officer, knowing that a Taser is designed to incapacitate instantly, could have believed that the force would incapacitate Barnes before he reached the window, while he was not in an "elevated position" and likely to fall. Under these circumstances, we conclude that the force used by Pollreis was reasonable.[2]

---

[2]McKenney also argues that a jury reasonably could conclude that Pollreis's use of force was unreasonable because Harrison admitted, during an interview, that he would have had Barnes handcuffed in "two seconds." But the context of Harrison's statement makes clear that he would have handcuffed Barnes in two seconds *if Barnes had not lunged toward the window*, not that he could have subdued and handcuffed Barnes in two seconds while Barnes was resisting or attempting to flee.

-8-

McKenney also asserts that because Barnes was mildly mentally retarded, the officers had a duty to ensure that Barnes understood the consequences of failing to comply with their orders. Accepting, however, that the mental capacity of the citizen bears on the reasonableness of the officer's conduct, the record does not support a finding that these officers knew that Barnes was mentally retarded. That Barnes did not say anything in response to Harrison's orders or ask the officers any questions did not place the officers on notice of a mental disability.

C.

McKenney also appeals the district court's dismissal of her state-law claim that Harrison and Pollreis were negligent in deploying Pollreis's Taser against Barnes. This claim was properly dismissed based on sovereign immunity. There is no genuine issue of fact about whether Pollreis intentionally deployed the Taser. McKenney's Fourth Amendment claim is premised on an assumption that the seizure was intentional, not accidental, *see Brower v. County of Inyo*, 489 U.S. 593, 596 (1989), and the evidence supports only that conclusion. If Pollreis's seizure of Barnes was unlawful under state law, therefore, it was a battery. *See State v. Washington*, 442 N.W.2d 395, 396 (Neb. 1989) ("A battery may be defined as any intentional, unlawful physical violence or contact inflicted on a human being without his consent."). Because the Nebraska Political Subdivisions Tort Claims Act retains sovereign immunity against claims "arising out of . . . battery," Neb. Rev. Stat. § 13-910(7), McKenney's state-law tort claim fails. *See McKenna v. Julian*, 763 N.W.2d 384, 391 (Neb. 2009).

D.

Finally, McKenney appeals her claim that the City is liable for negligently failing to train and supervise Harrison and Pollreis and in failing to develop and implement appropriate procedures governing the deployment of Tasers. Because the

district court properly dismissed the excessive force claims against the officers for lack of a constitutional violation, there can be no municipal liability. *City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986) (per curiam).

\* \* \*

The judgment of the district court is affirmed.

MURPHY, Circuit Judge, concurring.

While I concur in the opinion of the court, I believe that law enforcement use of tasers merits further reflection. This case illustrates one kind of tragic result that can follow the employment of a taser. The developing law on taser use must consider the unique nature of this type of weapon and the increased potential for possibly lethal results created by newer models.

Our cases have reacted to a variety of circumstances where tasers have been used, and they sometimes reflect unexpected consequences. In Mahamed v. Anderson, 612 F.3d 1084, 1086 (8th Cir. 2010), for example, a jailer used a taser on a screaming inmate lying on the floor of his own locked cell. The taser probes lodged in the inmate's testicle and hand, assertedly causing long term impotence, incontinence, and nerve damage. Qualified immunity was denied the jailer in that case. Id. at 1087. An officer who tased a woman refusing to leave her car during a traffic stop was also denied qualified immunity. Brown v. City of Golden Valley, 574 F.3d 491, 499–500 (8th Cir. 2009). A panel majority granted summary judgment in Cook v. City of Bella Vista, 582 F.3d 840, 849 (8th Cir. 2009), to an officer who had tased an angry man approaching him while he was trying to arrest the man's wife. Judge Shepherd dissented after concluding that it was unreasonable to "discharge [a] Taser simply because of insolence," especially given the tremendous pain tasers cause. Id. at 859–60.

-10-

In deciding claims of excessive force, we balance "the nature and quality of the intrusion . . . against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989); see Maj. Op. at 7. As we have previously observed, "case law related to the Taser is [in the] developing" stage. Brown, 574 F.3d at 498 n.5. While "the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force . . . , there is a lot of room between those end points." Mattos v. Agarano, 590 F.3d 1082, 1087 (9th Cir. 2010).

That the law is still evolving is illustrated in cases granting qualified immunity for that very reason. See, e.g., Bell v. Kansas City Police Dep't, No. 08-456, at 4–5 (W.D. Mo. Mar. 22, 2010) (granting qualified immunity to police officer in "close case" because "there is not enough law warning defendant against tasering to justify this [excessive force] litigation"). Local law enforcement policies also reflect differing views of where the taser fits on the "force continuum." Some allow taser use only as an alternative to deadly force, while others call for taser use whenever any force is justified. U.S. Gov't Accountability Office, GAO-05-464 Taser Weapons: Use of Tasers by Selected Law Enforcement Agencies 9–10 (2005) ("GAO Report").

Tasers fire metal probes into the skin, Brown, 574 F.3d at 495 n.3, penetrating up to half an inch. Bryan v. MacPherson, 630 F.3d 805, 810 (9th Cir. 2010) (Wardlaw, J., concurring). Connected by wires to the taser, the probes can deliver a 50,000 volt shock that lasts up to five seconds and causes "electrical muscular disruption." Brown, 574 F.3d at 495 n.3. Almost twenty years ago we described a taser shock as "a painful and frightening blow, which temporarily paralyzes the large muscles . . . , rendering the victim helpless." Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir. 1993). Hickey examined the older taser models, which already could cause "torment without marks" and paralyze local muscles. Id.

Although "one need not have personally endured a taser jolt to know the pain that must accompany it," Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009), the

sensation of high voltage electrical shock is outside common experience and can easily be underestimated. Unlike other police weapons, tasers can be fatally confused with guns, which further distinguishes them from older technologies. See, e.g., Torres v. City of Madera, 655 F. Supp. 2d 1109, 1118–19 (E.D. Cal. 2009) (officer fatally shot suspect, intending to tase him); Henry v. Purnell, 619 F.3d 323, 327 (4th Cir. 2010) (en banc pending) (officer shot suspect in elbow, intending to tase him). And especially with the newer tasers, the "nature and quality of [their] intrusion on the individual's Fourth Amendment interests," Graham, 490 U.S. at 396, is somewhat unique in that they render even the most pain tolerant individuals utterly limp.

It appears that the Omaha Police Department has changed its position on tasers at least once in the past several years. It is not however clear from the record in which exact circumstances OPD policy would permit the use of a taser. The officers asserted in affidavits that departmental policies "authorize the use of Taser weapons to stop a suspect who is trying to flee," Jt. App. 10, 16, and during an internal investigation the department's taser coordinator did not question Pollreis's use of a taser on a nonviolent suspect attempting to escape. Id. at 556. In contrast, the written policy in the record authorizes taser use on fleeing suspects only if they are "potentially dangerous or violent" or engaging in "active aggression" such as an assault. Id. 159, 330. This policy appears to have replaced a 2005 version, which was characterized by Omaha's public safety auditor as "one of the [country's] most liberal tasing policies" because it allowed taser use on nonviolent suspects who have not attempted to flee.[3] Id. 616.

The OPD materials in the record contain very little about incidents similar to the one here, where James Barnes suffered fatal injuries after receiving a taser shock,

---

[3]The auditor was fired in 2006 shortly after publishing a report that complained of "harsh and poor policing tactics in communities of color." Bonn v. City of Omaha, 623 F.3d 587, 589 (8th Cir. 2010).

then falling through an upper window and onto the ground. OPD's safety auditor had earlier suggested that the department adopt a model rule developed by the International Association of Chiefs of Police (IACP) which prohibits taser use "in any environment where the subject's fall could reasonably result in death." Jt. App. 620 & n.28.[4] Apparently that rule was never adopted by OPD. Instead, the training materials warn in small type, amid many pages featuring bold print and graphics, that officers "should consider" the risk of falling, since after tasing "the major muscles are locked" and render one "[un]able to break the fall." Jt. App. 311. They do not forbid taser use when falling poses a risk, however, or explain how to recognize such risky situations.

Since the record does not show that the OPD policies were "adopted with 'deliberate indifference' to [their] known or obvious consequences," Moyle v. Anderson, 571 F.3d 814, 817–18 (8th Cir. 2009), they cannot sustain McKenney's § 1983 claim against the city of Omaha. Nevertheless, law enforcement agencies would be well advised to address their potential liability from posttasing falls, both by rulemaking and by training. As many as thirteen percent of taser targets are injured by falls. See Michael R. Smith et al., The Impact of Conducted Energy Devices and Other Types of Force and Resistance on Officer and Suspect Injuries, 30 Policing: Int'l J. Police Strategies & Mgmt. 423, 428 (2007). It appears the majority of law enforcement agencies (and OPD) rely to some extent on training by manufacturer Taser, International, which claims a "0% injury rate" for the taser model used on

---

[4]IACP has also posed several questions deserving police departments' consideration, including: Should police use tasers on any or all fleeing suspects? Should police use tasers to compel compliance or only for defense? When, if ever, are multiple shocks allowed? Should police use tasers on the mentally disabled, children, the elderly, or the pregnant? International Association of Chiefs of Police, Electro-Muscular Disruption Technology: A Nine-Step Strategy for Effective Deployment 14 (2008).The adequacy of the manufacturer representations about taser use should also be considered when setting departmental standards.

Barnes. Bryan v. MacPherson, 630 F.3d 805, 815 (9th Cir. 2010) (Wardlaw, J., concurring); GAO Report at 11–12.

The unique effects of newer tasers, which cause both pain and full body paralysis, were considered by the Ninth Circuit in Bryan. The court rejected the notion that "because the taser results only in the 'temporary' infliction of pain, it constitutes a nonintrusive level of force." 630 F.3d at 825. Rather, tasers'

> physiological effects, . . . high levels of pain, and foreseeable risk of physical injury [make tasers] a greater intrusion than other non-lethal methods of force . . . . The pain is intense, is felt throughout the body, and . . . effectively commandeer[s] the victim's muscles and nerves. . . . Moreover, tasering [may cause] serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall.[5]
>
> The [taser] thus intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not.

630 F.3d at 825 (internal citations omitted).

The Bryan court also concluded that tasers "used in dart-mode constitute an intermediate, significant level of force that must be justified by the government interest involved." The court differentiated tasers used in "drive-stun" mode, where an officer presses electrical nodes against a person's body, from using a taser to fire metal darts into the body. Id. at 826. Both modes cause incapacitating pain, but only darts paralyze the entire body. Jt. App. 84.

---

[5] In Bryan, an officer tased a young man in boxer shorts from twenty feet away. Id. at 822. The man fell face down; the asphalt cracked four teeth and drove in a taser probe so deeply it needed surgical removal. Id. at 812, 814 (Wardlaw, J., concurring). See also Cavanaugh v. Woods Cross City, 625 F.3d 661, 663 (10th Cir. 2010) (taser victim suffered traumatic brain injury after falling onto concrete steps).

-14-

In this case Officer Pollreis used her taser's dart mode on James Barnes when she perceived that he might try to escape out a window. The taser's two metal probes lodged in his lower back. The weapon then did exactly what it was designed to do: it completely incapacitated Barnes's entire body. Instead of falling to the floor as Pollreis expected, Barnes smashed through the window and over the porch and fell onto the ground. The taser's paralyzing effect apparently made Barnes unable to break his fall, and he died of massive brain trauma a few days later. Even though the officers were serving only misdemeanor warrants, Pollreis was faced with "circumstances that [were] tense, uncertain, and rapidly evolving," Graham, 490 U.S. at 397, and she mistakenly believed she could stop Barnes safely. She was wrong.

Just as officers may use guns only against suspects posing a threat of serious physical harm, Tennessee v. Garner, 471 U.S. 1, 11 (1985), the use of tasers requires sufficient justification for their use to be reasonable. The Supreme Court refused to let "police technology . . . erode the privacy guaranteed by the Fourth Amendment" in Kyllo v. United States, 533 U.S. 27, 34 (2001), and the particular factual circumstances in which a taser has been used must be examined in the context of Fourth Amendment protections against excessive force.

_____