DAVIS, Circuit Judge,
concurring:
A rookie deputy sheriff (albeit one with more than two decades of relevant law enforcement experience), Deputy Purnell, having been provided with “minimal training” in the use of a Taser, goes, alone and without back-up officers, to the home of an offender, Henry, wanted on a misdemean- or warrant for failure to pay child support, to take the offender into custody on the warrant. The deputy has reason to believe, and indeed has actual knowledge, that Henry has no record of violence or threatening conduct toward law enforcement officers (or anyone else); indeed, this no doubt explains the absence of any backup officers. When Henry pointlessly runs away from Deputy Purnell, the deputy (who is carrying his newly-issued Taser on his “dominant side” inches from his Glock service pistol) mistakenly draws his Glock (which he had never before used in the field) instead of the Taser (with which he had only practiced once before) and, despite easily measurable differences in the weight and features of the two weapons, immediately discharges his Glock pistol and shoots and wounds the offender.
I am pleased to join Judge Gregory’s fine opinion for the en banc majority. The court holds that whether, under the totality of the circumstances of this case (properly drawing all inferences of fact in favor of Henry as the non-movant under Fed. R.Civ.P. 56), Deputy Purnell’s mistaken use of his Glock pistol to shoot Henry was reasonable, is a question for the jury and not properly determined as a matter of law. I write briefly to make three observations in response to the principal dissent (hereafter, “the dissent”).
First. The dissent (in some passages) seems to be in agreement with the en banc majority (and the parties) that this case does not present the hypothetical issue of whether the intentional use of the Taser by Deputy Purnell under the circumstances would have comported with the Fourth Amendment. See Dissenting Op. at 542 (“The dispositive question in this case is not whether it was reasonable for Deputy Purnell to use deadly force to stop Henry or even whether it was reasonable for the deputy to attempt to use his Taser.”) (emphasis added); id. at 548 n. 8 (“Henry does not claim that Deputy Purnell’s decision to use the Taser was unreasonable .... Therefore, we need not decide that issue.”) (emphasis added). But then, later on in the dissent, there is an implied finding on the very issue not presented: that actual use of the Taser would have been entirely appropriate. See id. at 552 (declaring, without qualification, that Deputy Purnell “made a mistake in his execution of an otherwise proper action”). It is even more perplexing that, in still another passage, the dissent demands an answer from the majority of the en banc court to the very question that is not presented: “[C]ould the deputy have used the Taser at all?” Dissenting Op. at 551.
The dissent’s serial disclaimers that “Taser use” is at issue here does little to obscure the dissent’s transparent confidence that the intentional use of a Taser by Deputy Purnell under the circumstances in the case before us would have comported with the Fourth Amendment. The dissent’s disappointment that this case is not about “Taser use” is entirely under *538 standable upon close scrutiny of its reasoning. This is because the entire dissent rests on the following tidy (but deeply flawed) syllogism:
* An officer’s use of a Taser is always permissible under the Fourth Amendment to effect the arrest of any fleeing suspect;
* An officer is permitted to make reasonable mistakes in effecting seizures without thereby violating the Fourth Amendment; therefore
* As a matter of law, Deputy Purnell’s mistaken use of weapon one [the Glock] instead of weapon two [the Taser] to effect a seizure of the fleeing Henry was reasonable and therefore did not violate the Fourth Amendment.
In other words, under the dissent’s perspective on this case, it is the very reasonableness (purportedly, as a matter of law) of the intended use of the Taser against an unarmed, nonviolent misdemeanant fleeing on foot that renders the mistaken use of the Glock “a reasonable mistake.”
That this is the dissent’s mode of analysis is made clear (again, despite the serial disclaimers) by the dissent’s citation, as “instructive,” see Dissenting Op. at 548 n. 8, to a case decided several days after the en banc argument in this case, McKenney v. Harrison, 635 F.3d 354 (8th Cir.2011) (affirming lower court’s grant of summary judgment that use of Taser on a fleeing misdemeanor offender did not constitute an unreasonable seizure). Even a cursory examination of McKenney, however, demonstrates that the facts in that case are not remotely similar to the facts in the case at bar. The dissent’s citation to that case in no manner undermines the majority’s reasoning or the outcome in this case.
In McKenney, the offender had earlier fled by automobile from the arresting officer, who had made a traffic stop of the offender. Id. at 356-57. Three arrest warrants were issued for the offender. Id. Several weeks after the initial encounter during the traffic stop, the offender was actually arrested on the three warrants while in the second floor bathroom of his residence while naked. Id. at 357. The two arresting officers escorted the offender to a nearby bedroom and allowed him to dress before handcuffing him and removing him from the residence. Id. Significantly, they observed that as he was donning his clothing, he looked about suspiciously toward an uncovered window, which opened out to a porch roof below the second floor.
Upon making this observation, one officer unholstered her Taser and orally warned the suspect “not to do anything stupid,” id, and admonished him, “you don’t want to be tased.” Id Despite the warning, the offender made a sudden break for the window, and the officer discharged her Taser. Id. As a result of being tased, the offender went through the window uncontrollably, somehow missed the porch roof or otherwise continued his fall such that he came off the porch roof and landed on the ground. He died four days later from head trauma suffered in his fall. Id at 357-58.
The Eighth Circuit affirmed the district court’s grant of summary judgment as to, inter alia, the Fourth Amendment excessive force claim instituted by the offender’s mother based on the officer’s use of the Taser. In affirming the district court’s determination that, as a matter of law, the use of the Taser under the circumstances was not an instance of actionable Fourth Amendment excessive force, our sister circuit reasoned as follows:
When Barnes made a sudden movement toward the window, which the officers reasonably interpreted as an active attempt to evade arrest by flight, the officers were entitled to use force to prevent Barnes’s escape and effect the *539 arrest.... Although the charges were limited to misdemeanors, the officers executing the warrant were not required to let Barnes run free.
Despite the fatal consequences of the incident, the level of force employed also was not unreasonable. Pollreis used only a single Taser shock. She was required to react in a split second as Barnes sought to escape through a window only six to eight feet away. The alternative of attempting to subdue Barnes by tackling him posed a risk to the safety of the officer and did not ensure a successful arrest. The officers had warned Barnes. Just before he lunged, Harrison told Barnes not to do anything stupid, and Pollreis said “you don’t want to be tased.” And although the outcome was tragic, a reasonable officer, knowing that a Taser is designed to incapacitate instantly, could have believed that the force would incapacitate Barnes before he reached the window, while he was not in an “elevated position” and likely to fall. Under these circumstances, we conclude that the force used by Pollreis was reasonable.
Id. at 360 (citation and footnote omitted). It is quite clear that the circumstances of the case at bar could not be more unlike those presented in McKenney, which involved a suspect (who had only weeks previously sped off in an automobile from law enforcement during a traffic stop *) in the actual custody of two law enforcement officers in a closed room, acting suspiciously as if he was planning to escape, and who ignored express oral warnings by one of the officers who had unholstered her Taser and who had it at the ready when the offender’s sudden movement prompted her to discharge the Taser.
The dissent’s unbridled confidence that use of a Taser would have been permissible here is unwarranted, of course, because neither party to this case has presented or argued that issue. It is unwarranted, as well, based on the thoughtful concurring opinion of Circuit Judge Murphy in McKenney, who forthrightly acknowledged that the objective reasonableness of the use of Tasers continues to pose difficult challenges to law enforcement agencies and courts alike. It is, indeed, Judge Murphy’s opinion that is most “instructive”:
While I concur in the opinion of the court, I believe that law enforcement use of tasers merits further reflection. This case illustrates one kind of tragic result that can follow the employment of a taser. The developing law on taser use must consider the unique nature of this type of weapon and the increased potential for possibly lethal results created by newer models.
Our cases have reacted to a variety of circumstances where tasers have been used, and they sometimes reflect unexpected consequences. In Mahamed v. Anderson, 612 F.3d 1084, 1086 (8th Cir.2010), for example, a jailer used a taser on a screaming inmate lying on the floor of his own locked cell. The taser probes lodged in the inmate’s testicle and hand, assertedly causing long term impotence, incontinence, and nerve damage. Qualified immunity was denied the jailer in *540 that case. Id. at 1087. An officer who tased a woman refusing to leave her car during a traffic stop was also denied qualified immunity. Brown v. City of Golden Valley, 574 F.3d 491, 499-500 (8th Cir.2009). A panel majority granted summary judgment in Cook v. City of Bella Villa, 582 F.3d 840, 849 (8th Cir.2009), to an officer who had tased an angry man approaching him while he was trying to arrest the man’s wife. Judge Shepherd dissented after concluding that it was unreasonable to “discharge [a] Taser simply because of insolence,” especially given the tremendous pain tasers cause. Id. at 859-60.
In deciding claims of excessive force, we balance “the nature and quality of the intrusion ... against the countervailing governmental interests at stake.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); see Maj. Op. at 359. As we have previously observed, “case law related to the Taser is [in the] developing” stage. Brown, 574 F.3d at 498 n. 5. While “the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force ..., there is a lot of room between those end points.” Mottos v. Agarano, 590 F.3d 1082, 1087 (9th Cir.2010).
That the law is still evolving is illustrated in cases granting qualified immunity for that very reason. See, e.g., Bell v. Kansas City Police Dep’t, No. 08-456, at 4-5 (W.D.Mo. Mar. 22, 2010) (granting qualified immunity to police officer in “close case” because “there is not enough law warning defendant against tasering to justify this [excessive force] litigation”). Local law enforcement policies also reflect differing views of where the taser fits on the “force continuum.” Some allow taser use only as an alternative to deadly force, while others call for taser use whenever any force is justified. U.S. Gov’t Accountability Office, GAO-05-464 Taser Weapons: Use of Tasers by Selected Law Enforcement Agencies 9-10 (2005) (“GAO Report”).
In this case Officer Pollreis used her taser’s dart mode on James Barnes when she perceived that he might try to escape out a window. The taser’s two metal probes lodged in his lower back. The weapon then did exactly what it was designed to do: it completely incapacitated Barnes’s entire body. Instead of falling to the floor as Pollreis expected, Barnes smashed through the window and over the porch and fell onto the ground. The taser’s paralyzing effect apparently made Barnes unable to break his fall, and he died of massive brain trauma a few days later. Even though the officers were serving only misdemeanor warrants, Pollreis was faced with “circumstances that [were] tense, uncertain, and rapidly evolving,” Graham, 490 U.S. at 397, 109 S.Ct. 1865, and she mistakenly believed she could stop Barnes safely. She was wrong.
Just as officers may use guns only against suspects posing a threat of serious physical harm, Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the use of tasers requires sufficient justification for their use to be reasonable. The Supreme Court refused to let “police technology ... erode the privacy guaranteed by the Fourth Amendment” in Kyllo v. United States, 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), and the particular factual circumstances in which a taser has been used must be examined in the context of Fourth Amendment protections against excessive force.
Id. at 361-64.
Judge Murphy’s insightful observations wisely counsel caution against a hasty determination of the reasonableness vel non *541 of Taser use by law enforcement officers in the abstract. See also Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir.2008) (“We have previously held that in a ‘difficult, tense and uncertain situation’ the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force. Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir.2004).”) (emphasis added); Parker v. Gerrish, 547 F.3d 1, 8-11 (1st Cir.2008) (affirming jury verdict that officer used excessive force in tasering an arrestee).
Henry chose not to assert a hypothetical claim of excessive force based on Deputy’s Purnell’s intended use of the Taser in the circumstances of this case, and the majority of the en banc court appropriately leaves for another day (and for consideration in a ease in which the issue is actually presented) determination of that issue.
Second. The dissent protests that “[its] analysis does not even address, much less justify, the intentional use of deadly force.” Dissenting Op. at 549 n. 10. And yet, one of the principal cases on which the dissent relies to support its conclusion that Henry failed to project sufficient evidence that Deputy Purnell committed a Fourth Amendment excessive force violation involved an officer’s “intentional use of deadly force.” See Dissenting Op. at 546-47, 549-50 (citing, quoting, and reasoning on the basis of Anderson v. Russell, 247 F.3d 125 (4th Cir.2001)). Russell was not a case of “mistaken” use of deadly force; to the contrary, it was a case in which the use of deadly force was, manifestly, “intentional.”
There, a local police officer, Russell, working supplemental employment as a shopping mall security guard, learned from a mall patron that an intoxicated man, Anderson, wearing earphones and a hat, who was openly drinking wine while walking around the mall, appeared to be armed. Id. at 127-28. Thereafter, Russell surveilled and observed Anderson for more than twenty minutes and, specifically, he observed a bulge under Anderson’s sweater precisely where one might expect a firearm to be secreted, thereby “corroborating the citizen’s report.” Id. at 128. Thus, as the panel in Russell correctly recognized, the officer had at least reasonable suspicion to seize the man, make inquiry, and to conduct a pat down search, and to do so in a manner that provided an assurance of safety for the officers and any persons in the immediate area. Id. at 130 (“Once Russell perceived a bulge consistent with the shape of a gun, he was justified in believing that Anderson was armed and dangerous.”).
With their guns drawn, Russell and another officer confronted Anderson and ordered Anderson to “raise his hands and get down on his knees.” Id. Although Anderson at first raised his hands, before the officers could conduct a pat-down and secure the situation, he began lowering his hands and “reaching toward what Russell believed to be a gun.” Id. at 131. Thus, Officer Russell, having more than a reasonable basis for believing that the man was armed and that he was reaching for a firearm in defiance of a direct order by the police, shot Anderson three times. Id. In fact, the bulge observed by the mall patron (and later, by the officer) was an eyeglass case. Anderson (who was wearing earphones) had been reaching to remove the radio from his back pocket; he was not armed. Id.
Anderson survived his wounds and sought damages against the shooter pursuant to § 1983 based on Russell’s alleged excessive force in effecting a seizure in violation of the Fourth Amendment. The jury returned a verdict for Anderson, finding that (1) the officer used excessive force and (2) the officer was not entitled to qualified immunity. Officer Russell re *542 newed his motion for judgment as to each of those issues after the verdict; the district court denied the motion as to excessive force but granted the motion as to qualified immunity. On cross-appeals by the parties, we concluded, as mentioned above, that “as a matter of law, Russell’s use of force did not violate the Fourth Amendment and, therefore, that the § 1983 excessive force claim should not have been submitted to the jury.” Id. at 129.
Thus, Russell was not a case of a “mistake” in any sense relevant to the case at bar. Both the mall patron and the surveilling officer drew an inference, a reasonable inference, as this court repeatedly noted, that the man was armed and, indeed, later, that he was attempting to draw a firearm in response to an order by the officer that he raise his hands. A reasonable inference based on percipient witness observations is nonetheless reasonable even where the factual basis underlying the inference is other than as supposed. Such a reasonable inference is not for that reason a mistaken inference. Most assuredly, in Russell, the officer intended to discharge his firearm at the suspect, and he did so, shooting him three times.
Like so many of the other cases relied on by the dissent, e.g., those dealing with mistaken searches of the wrong apartment, Russell bears no resemblance whatsoever to the case at bar. Plainly, an accumulation of abstract legal propositions extracted from dissimilar cases provides scant assistance in the decision of actual cases; rather, it is the careful application of legal principles to the summary judgment record presented before us that does so.
Third. The dissent apparently finds it odd that the majority is not granting summary judgment in favor of Plaintiff Henry since, in its view, there is no genuine dispute of material fact evident in this record. That is plainly incorrect. The dissent asserts, and all agree, that where there exists no genuine dispute of material fact, the objective reasonableness of a particular use of force is an issue of law for the court. Scott v. Harris, 550 U.S. 372, 378-79 & n. 5, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (holding that video recording of plaintiffs encounter with police “sp[oke] for itself’ and established the absence of any genuine dispute of material fact bearing on objective reasonableness). In the case at bar, of course, the issue is not the reasonableness of Deputy Purnell’s use of his Glock to seize Henry. All agree that the use of the Glock to seize Henry was unreasonable under the facts and circumstances of this case. The issue presented, as the dissent further acknowledges, is the reasonableness of Deputy Purnell’s mistake in unholstering and discharging his Glock. If the mistake was reasonable, then the Fourth Amendment renders the seizure reasonable. As the majority opinion makes perfectly clear, genuine disputes of material historical and inferential facts absolutely surround the issue of the reasonableness of Deputy Purnell’s mistake, and a jury of his peers is the proper factfinder as to the ultimate question. The dissent’s insistence on blinking at those facts and circumstances, or its inability or refusal to draw those inferences in favor of Henry because, as discussed above, it wants this case to be about the intended use of the Taser, does not alter that reality. Cf. Scott, 550 U.S. at 383, 127 S.Ct. 1769 (“[I]n the end we must still slosh our way through the fact-bound morass of ‘reasonableness.’ ”).
With these additional observations, I am pleased to join Judge Gregory’s opinion for the en banc court.

 Recently, in the context of the Supreme Court's evolving sentencing jurisprudence, the Court explained the commonsense reasons why a suspect’s knowing or intentional use of an automobile to flee from law enforcement significantly raises the stakes in the potential for violence by such suspects. See Sykes v. United States,-U.S.-, 131 S.Ct. 2267, 2272-75, 180 L.Ed.2d 60 (2011) (holding that a conviction under Indiana law of the driver of an automobile who knowingly or intentionally flees from a police officer constitutes a "violent felony” prior conviction under the federal Armed Career Criminal Act, 18 U.S.C. § 924(e)).