[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————

No. 05-10863

————————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 6, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-62225 CV-JIC

DRESDNER BANK AG, Dresdner Bank AG in Hamburg,
NORDDEUTSCHE LANDESBANK-GIROZENTRALE
KREDITANSTALT FUR,

Plaintiffs-Cross-
Defendants-Appellants,

BLOHM AND VOSS GMBH, et al.,

Intervenor-Plaintiffs,

ZERNAVI SERVISI MARITTIMI SRL,

Intervenor-Plaintiff
Appellee,

MONACO TELECOM INTERNATIONAL,

Intervenor-Plaintiff-
Cross-Claimant,

versus

M/V OLYMPIA VOYAGER, a 157.90 meter Blohm Voss GmbH
motor vessel, Hull No. 961, Greek official number 10750, her engines,
tackle equipment, rigging, dinghies, furniture, appurtenances, etc.,

in rem, and Olympic World Cruises Inc. her owner, in personam,

Defendant.

---

Appeal from the United States District Court
for the Southern District of Florida

---

**(September 6, 2006)**

Before DUBINA, MARCUS and COX, Circuit Judges.

DUBINA, Circuit Judge:

In this admiralty appeal, we consider whether the district court properly applied United States law to enforce a maritime lien, claimed by an Italian ship catering company, for providing necessaries to a Greek-flagged cruise vessel while the vessel was in a United States port. We conclude that the district court correctly applied United States law. Accordingly, we affirm the district court's judgment.

## I. Introduction

This case is properly introduced by another opinion of this court, *Dresdner Bank AG v. M/V Olympia Voyager*, 446 F.3d 1377 (11th Cir. 2006), which involved the same overall foreclosure proceedings against the cruise vessel at

2

issue in this appeal, but concerned the claim of a separate intervenor, Aktina Travel, S.A.:

> This appeal arises out of an action filed by Dresdner Bank AG in Hamburg, Kreditandstalt Fur Wiederaufbau, and Norddeutsche Landesbank-Girozentrale (collectivley, "the Banks") to foreclose a preferred ship mortgage on a foreign vessel. The Banks filed a complaint in the Southern District of Florida in rem against the M/V Olympia Voyager ("the Vessel"), a Greek-flagged passenger cruise vessel, and in personam against Olympic World Cruises ("OWC"), the owner of the Vessel.
>
> The district court entered a default judgment of foreclosure against the Vessel and ordered it sold. Subsequently, numerous parties filed claims or motions to intervene to assert claims against the Vessel or the proceeds of its sale. In response to these claims and motions, the district court entered an order requiring the Banks to provide security for any claims found to be superior in priority to the preferred ship mortgage, and allowing the Banks to stand in the shoes of the Vessel to defend against all claimants asserting such priority.

*Id.* at 1379. On January 13, 2005, after a bench trial, the district court entered a final judgment in favor of intervenor Zernavi Servisi Marittimi SRL ("Zernavi") on its claim against the Vessel. The Banks appeal.

## II. Background

In October 2003, representatives of Zernavi, an Italian ship catering company, met with representatives of Royal Olympic Lines, Inc. and/or Royal Olympia Cruises (collectively, "ROC"), the operator of the Vessel, in Greece to begin negotiations for Zernavi to provide victualing and food and beverage

management to the Vessel. The parties reached agreement on the services Zernavi would provide and the prices to be charged, with the details of the agreement to be finalized in continuing negotiations. The negotiations continued into November 2003, when the Vessel made its positioning voyage from Greece to Florida, where it would operate for the winter months from the "home port" of Port Everglades in Fort Lauderdale, Florida. Before the Vessel left on the positioning voyage, Zernavi assumed control of the victualing and food and beverage management. Accordingly, Zernavi purchased $243,616.56 worth of existing food and beverage items already onboard the Vessel and in a shore-side warehouse in Greece that were owned by OWC and ROC, and loaded the warehouse items onto the vessel before it left the Mediterranean Sea.

During the positioning voyage Zernavi had one full-time representative onboard the vessel, Giuseppe Longo ("Longo"), and another representative, Vincenzo Orlandini ("Orlandini"), who was onboard for part of the voyage. Upon arriving in Florida, Zernavi issued invoices totaling $225,920.77 for items consumed and services rendered during the positioning voyage.

Orlandini, along with another Zernavi representative, Massimo Guglielmo ("Guglielmo"), met the Vessel when it arrived in Fort Lauderdale, Florida. From Florida, they organized Zernavi's purchase of food, beverage, and food service

4

items from United States suppliers and had the items loaded onto the Vessel before it conducted cruises from Port Everglades. Together, Longo, Orlandini, and Guglielmo provided food and beverage management services both while the Vessel was in Port Everglades, and while the Vessel conducted cruises from its home port of Port Everglades.

The Vessel made two cruises from Port Everglades: the first was from November 30, 2003, to December 17, 2003, and the second was from December 17, 2003, to January 2, 2004. Zernavi issued invoices to the Vessel totaling $222,485.47 for items consumed and services rendered during the first cruise, and invoices totaling $227,238.88 for items consumed and services rendered during the second cruise. Zernavi also issued invoices related to items consumed and services rendered on both cruises that totaled $40,771.96. All together, Zernavi's invoices for the two cruises from Port Everglades amounted to $490,496.31.

At the end of December 2003, after the second cruise had already departed from Port Everglades, ROC submitted a proposed contract to Zernavi for its approval. However, the proposed contract included several provisions that were either directly opposite Zernavi's proposals or had not yet been negotiated, including an English choice of law provision. Zernavi never signed ROC's proposed contract and explicitly rejected it during a telephone conversation.

5

Ultimately, OWC filed for bankruptcy protection and the Banks filed this action to foreclose on the Vessel.

After the vessel ceased operations, Zernavi sold to the Vessel and her owners the food, beverage, and food service items that remained onboard after the conclusion of the second Port Everglades cruise on January 2, 2004. Zernavi and representatives for the Vessel conducted a full inventory of the remaining items, and Zernavi issued invoices to OWC and ROC totaling $420,646.22.

Zernavi filed a motion to intervene in this action, claiming that it was entitled to a maritime lien under the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*, which grants priority to creditors holding maritime liens for necessaries provided in the United States over those holding preferred mortgages on foreign vessels. *See* 46 U.S.C. § 31326. The Banks contested Zernavi's claim, arguing that English law should be applied to Zernavi's claim under the choice of law provision in the proposed contract that ROC submitted to Zernavi in December, or, alternatively, that Greek law should apply. The Banks claim that neither English nor Greek law would give Zernavi's claim priority over the Banks' preferred ship mortgage.

The district court found that Zernavi never agreed to the proposed contract, and did not agree to any choice of law provision. The district court ultimately

6

determined that United States law should apply, and that Zernavi was entitled to a maritime lien under CIMLA, which was superior in priority to the Banks' preferred ship mortgage. The district court determined that Zernavi was not entitled to a lien for the invoices totaling $225,920.77 related to bringing the Vessel from Greece, as those items and services were not provided in the United States. This amount was offset by the $243,616.56 credit Zernavi gave the Vessel to purchase the existing inventory on the Vessel when Zernavi began servicing the Vessel in Greece. Accordingly, the district court concluded Zernavi is entitled to a preferred maritime lien for $893,446.74, arriving at that amount by adding the invoices from the two cruises from Port Everglades ($490,496.31) and the items sold to the Vessel after the cruises ($420,646.22), and deducting the remaining credit due the Vessel after the positioning voyage ($17,695.79).

### III.  Issues

1.  Whether United States law properly applies to Zernavi's claim.

2.  Whether Zernavi was a supplier of necessaries in the United States and entitled to a superior maritime lien under 46 U.S.C. § 31301, *et seq.*

3.  Whether the district court erred in calculating the amount of the final judgment entered in favor of Zernavi for $893,336.74.

7

## IV. Standards of Review

We review choice of law determinations *de novo*. *Sigalas v. Lido Mar., Inc.*, 776 F.2d 1512, 1516 (11th Cir. 1985). The factual findings underpinning a choice of law determination are reviewed for clear error. *Szumlicz v. Norwegian Am. Line, Inc.*, 698 F.2d 1192, 1196 (11th Cir. 1983). We review the factual findings of a district court sitting without a jury in admiralty under the clearly erroneous standard, and its conclusions of law *de novo*. *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1228 (11th Cir. 2000).

## V. Discussion

A. *Choice of Law*

1. The Proposed Contract

The Banks first argue that the choice of law is determined by the English choice of law provision included in the proposed contract that ROC submitted to Zernavi, which Zernavi explicitly rejected and refused to sign. The district court found that in October 2003 the parties (OWC, ROC, and Zernavi) reached an agreement for Zernavi to provide certain victualing and food and beverage services to the Vessel, and agreed upon the pricing for the goods and services. However, the court found that the proposed contract did not represent the agreement of the parties, and Zernavi unequivocally rejected the proposed

8

contract. The court found that because Zernavi had not agreed to any choice of law provision, the English choice of law provision is not binding.

The Banks do not contest these findings of fact, and do not argue that Zernavi at any time agreed to the English choice of law provision. Instead, they argue that Zernavi is bound by the terms of the proposed contract because Zernavi referenced the proposed contract as an exhibit in its initial Verified Intervening Complaint in rem. The Banks contend that it is a principle of contract law that a party can not sue for damages under a contract while simultaneously seeking to repudiate that same contract. *See MCA Television, Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1275 (11th Cir. 1999). However, Zernavi did not seek damages under the proposed contract; Zernavi argued throughout the course of proceedings that it had never agreed to the provisions of the proposed contract and was basing its theory of recovery not on the proposed contract, but on its maritime lien for necessaries under CIMLA. Further, to eradicate any doubt that it might be proceeding with a claim of damages based on the proposed contract in its initial pleadings, Zernavi made an ore tenus motion at trial to amend its complaint to conform with the evidence that it had rejected the document. The district court, finding that the Banks had been on notice of Zernavi's position regarding the contract and would not be prejudiced, granted the motion. An amended pleading

9

supersedes the former pleading; "the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." *Procter & Gamble Defense Corp. v. Bean*, 146 F.2d 598, 601 n.7 (5th Cir. 1945).[1] Even if Zernavi's original complaint could be construed to affirm the proposed contract, that pleading was wholly superceded by the amended complaint which proceeded under a different theory. Accordingly, because Zernavi never agreed to the proposed English choice of law provision and did not base its theory of recovery upon the rejected document that contained that provision, we conclude that English law does not control its claim.

2. Choice of Law Analysis

Because there is not a controlling contractual choice of law provision, we must conduct a choice of law analysis. In the related case, *Dresdner Bank*, 446 F.3d at 1381-84, this court set out the proper analysis for choice of law problems in maritime contract cases, adopting the approach used in *Gulf Trading & Transp. Co. v. The Vessel Hoegh Shield*, 658 F.2d 363, 366-368 (5th Cir. 1981). The first step is to determine if a conflict exists. *Dresdner Bank*, 446 F.3d at 1381. In this case, United States law leads to the conclusion that Zernavi is entitled to a

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207-09 (11th Cir. 1981) (en banc), this court adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981.

10

maritime lien, while the application of Greek law leads to the opposite conclusion. Because there is a conflict, we must determine which nation's laws to apply using the Restatement (Second) of Conflicts of Law, §§ 6 and 188, as well as governmental interest analysis. *See id.* at 1381-82.

Under the Restatement, the court seeks to "determine which sovereign entity has the 'most significant relationship' with the transaction at issue." *Id.* at 1382. Section 188 sets forth specific factors to consider in the context of contracts: (a) the place of contracting; (b) the place of negotiation; (c) the place of performance; (d) the locus of the subject matter of the contract; and (e) the domicile of the parties. Restatement (Second) of Conflict of Laws § 188(2) (1971). The district court noted, and the parties do not contest, that the place of contracting and negotiation was Greece. Further, it is not contested that Zernavi is an Italian company, OWC is a Liberian company, and the Vessel flies a Greek flag.

The Banks, however, contest the district court's finding of fact that the place of performance was the United States. The Banks argue that the place of performance was actually Italy – Zernavi's principal place of business. The Banks argue that Zernavi actually performed the contract in Italy, by completing a significant portion of the planning for its services at its home office in Italy, and arranging, also from its home office in Italy, for local suppliers in the United

11

States to furnish supplies to the Vessel in Port Everglades. They further argue that the presence of Zernavi representatives in Florida was not in furtherance of its performance, but was merely incidental to the performance of the contract in Italy.

The Banks' characterization, however, is not persuasive. Zernavi had representatives in Florida who procured provisions from local sources, loaded those supplies onto the ship while it was in Port Everglades, and provided food and beverage management while the Vessel conducted cruises based out of Port Everglades. Even though Zernavi conducted some organizational activities from Italy, the place of performance was where the Vessel was supplied, namely, the United States. Accordingly, we conclude that the district court did not clearly err in finding that the place of performance of the contract was the United States.

Though the district court did not make a finding on the locus of the subject matter of the contract, and the parties did not brief that factor on appeal, we nevertheless briefly look to that consideration to further our analysis. OWC, ROC, and Zernavi agreed that Zernavi was to provide victualing and food and beverage management services to the Vessel while its home port was in Florida. The services were for the exclusive benefit of the Vessel and directly related to the operation and performance of the Vessel in the United States. As such, we

12

conclude that the locus of the subject matter of the agreement was also the United States.

The analysis under the Restatement is not complete, however, as § 6 provides a list of general considerations courts should apply in any choice of law analysis: (a) the needs of the international system; (b) the relevant policies of the forum (CIMLA); (c) the relevant policies of other interested states (Greece's maritime law that does not give priority to maritime liens for necessaries); (d) the protection of justified expectations; (e) the policy underlying the field of law in question; (f) the interest in predictability and uniformity; and (g) the ease in determining and applying the relevant law. The district court did not rely on these factors, and the parties did not brief them on appeal. However, consistent with our approach in *Dresdner*, we consider them in our analysis. 446 F.3d at 1383. In applying these factors, (b) and (g) clearly favor United States law and (c) clearly favors Greek law. Further, courts of this country have recognized that CIMLA, by assuring the priority of a lien for necessaries, encourages the prompt furnishing of vessels and serves the basic policies underlying the international legal system and maritime law. *See Hoegh Shield*, 658 F.2d at 367-68. Thus, factors (a) and (e) counsel in favor of United States law as well. Additionally, a uniform application of CIMLA is important to assure that both suppliers and vessels will justifiably

13

expect that a supplier that furnishes necessaries to a vessel in a United States port will be protected. *See id.* at 368. Thus, factors (d) and (f) also counsel in favor of United States law.

Given that the factors of § 6 almost exclusively indicate that United States law should apply, and that the § 188 place of performance and locus of the subject matter was within the United States, it is clear that, under the Restatement analysis, the United States is the entity with the most significant relationship to the transaction at issue.

The analysis is still not complete, however, as we must also consider the choice of law under a governmental interest analysis. *Dresdner Bank*, 446 F.3d at 1383. As was the case with some of the factors under the Restatement, the district court did not rely upon a governmental interest analysis, and the parties did not brief this approach on appeal. Nevertheless, under *Dresdner*, we briefly analyze the competing government interests to complete our analysis. 446 F.3d at 1383. Greece has an interest in regulating contracts that are created in Greece, and in determining the proper protections for vessels that fly the Greek flag. However, Greece's interests and connections to this transaction are not nearly as significant as those of the United States. The United States has a very strong interest in regulating transactions and the flow of goods in and out of its ports, and in

14

assuring that those supplying necessary goods and services to ships in United States ports are protected. It also has a strong interest in regulating the transactions and the activities of vessels operating in the United States as a home port. Thus, the governmental interest analysis also favors application of United States law.

Given that our analysis under both the Restatement and governmental interest framework favors application of United States law over Greek law, we hold that United States law is the proper law to apply to Zernavi's claim.

B. *The Maritime Lien*

A party is entitled to a maritime lien under CIMLA if it provided necessaries to a vessel on the order of the owner or a person authorized by the owner. 46 U.S.C. § 31342. The Banks do not contest that the items and services supplied to the Vessel by Zernavi constituted necessaries, nor that Zernavi provided the necessaries to the Vessel with the authorization from the owner. Accordingly, it is undisputed that Zernavi holds a valid maritime lien for necessaries. What the Banks contest, however, is whether Zernavi's maritime lien is superior in priority to the Banks' preferred ship mortgage. CIMLA provides that a preferred mortgage lien on a foreign vessel (which has not been otherwise guaranteed by statute) "is subordinate to a maritime lien for necessaries *provided*

*in the United States.*" 46 U.S.C. § 31326(b)(2) (emphasis added). The Banks

argue that because some of Zernavi's activities relating to supplying the Vessel

were orchestrated in Italy, the necessaries were not "provided in the United

States." The statute does not require that the party asserting the maritime lien be a

United States entity, nor that all of the activities related to the provision of

necessaries take place inside the United States; all that is required is that the

necessaries be provided to the Vessel in the United States. *See id.* Zernavi loaded

goods onto the Vessel and provided services to the Vessel while it was in a United

States port. That is all that the statute requires. Accordingly, we conclude that the

Banks' preferred ship mortgage is subordinate to Zernavi's maritime lien for

necessaries.

C. *Amount of Final Judgment*

The Banks argue that the district court erred in calculating the amount of

final judgment by including the amount invoiced for the inventory that remained

onboard when the Vessel ceased operations, essentially charging for goods that

had already been charged in prior invoices. The Banks are incorrect.

The invoices for the first and second cruises were for services rendered and

goods consumed during those cruises, not the total amount of inventory that had

been loaded onto the Vessel. After the cruises, the unconsumed inventory onboard

16

the Vessel belonged to Zernavi. Zernavi, in terminating its relationship to the Vessel, then sold the remaining inventory to the Vessel while it was in Port Everglades, much as when Zernavi purchased what inventory was already onboard the Vessel from OWC when it took control of the victualing and food and beverage management of the Vessel. The Vessel had not already been billed for the unconsumed inventory. Accordingly, we conclude that the district court's calculation of the amount of final judgment was correct.

## VI. Conclusion

Based on the foregoing discussion, we conclude that Zernavi is entitled to a maritime lien for necessaries with priority over the Banks' preferred ship mortgage. Accordingly, we affirm the judgment of the district court.

AFFIRMED.