[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12482

_____

D.C. Docket No. 1:11-cv-22358-JAL


JAMES EDWARD HOEFLING, JR.,

Plaintiff - Appellant,

versus

CITY OF MIAMI,
RICARDO ROQUE,
JOSE GONZALEZ,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 25, 2016)

Before JORDAN and JULIE CARNES, Circuit Judges, and GOLDBERG,[*] Judge.

JORDAN, Circuit Judge:

For about eight years, James Edward Hoefling, Jr. lived on his 29-foot sailboat in state waters off the South Florida coast.  In August of 2010, however, City of Miami marine patrol officers seized the sailboat and had it destroyed. According to Mr. Hoefling—who sued the City and its officers under 42 U.S.C. § 1983, federal maritime law, and state law—they did so unlawfully, without justification and without notice.

Mr. Hoefling appeals from the district court's dismissal of his second amended complaint in its entirety.    After a review of the record, and with the benefit of oral argument, we conclude that the district court got some things right and some things wrong.  We therefore affirm in part, reverse in part, and remand for further proceedings.

**I**

The second amended complaint, which is the operative pleading, alleges the following facts, which we accept as true.  *See Timson v. Sampson*, 518 F.3d 870, 872 (11th Cir. 2008).

---

[*] Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

**A**

In late May of 2010, while Mr. Hoefling was aboard his sailboat in Dinner Key, several City marine patrol officers pulled alongside in their own vessel. At the time, the sailboat was seaworthy and had an intact hull, a mast, an engine, a rudder, working sails (which were stored in the cabin), and an anchor light. Mr. Hoefling told the officers that he was the owner of the sailboat, produced U.S. Coast Guard documentation of his ownership, and provided his driver's license and cell phone number. Officer Alejandro Macias incorrectly opined to Mr. Hoefling that the sailboat was derelict or at risk of being derelict. Contrary to what Officer Macias said, the sailboat was not derelict under Florida law, as it was not "left, stored, or abandoned" in a "wrecked, junked, or substantially dismantled condition." Fla. Stat. § 823.11.

None of the officers advised Mr. Hoefling that he was at risk of having his sailboat taken away or destroyed. One of the officers, however, cited Mr. Hoefling for not having a marine sanitary device and told him that he should get a better anchor light. The officers also told Mr. Hoefling that he needed to take care of these issues "or move his vessel."

Before leaving, one of the officers placed a City of Miami code enforcement notice on the side of the vessel. The notice contained five boxes with possible code violations (lost or abandoned property, goods stored on private property,

3

property unlawfully parked in a residential district, vessel obstructing an established City channel, and unlawful anchoring, mooring, or docking). None of the five boxes on the notice, however, were checked off.

Within days of his interaction with the officers, Mr. Hoefling purchased a marine sanitary device and installed a better anchor light. He continued to live in the sailboat for the next three months. During that time, he received no further communication from the City indicating that he had to do more to bring his sailboat into legal compliance.

On August 20, 2010, while he was on a short trip for work-related reasons, Mr. Hoefling received a call from a friend who told him that the police had taken his sailboat. Mr. Hoefling later found out that this was part of the City's systematic roundup and destruction of ugly boats—what the City calls a "cleanup" program.

When he returned from his trip, he learned that the City and two of its marine patrol officers—Officer Ricardo Roque and Sergeant Jose Gonzalez—had seized and destroyed his sailboat and everything contained inside. He eventually located the remains of his sailboat and personal possessions in a trash dumpster. In the years since the destruction of his sailboat, Mr. Hoefling has been forced to live a transient lifestyle, requiring the assistance of others for shelter and other necessities.

4

According to the second amended complaint, the City and its officers did not have the legal authority to seize and destroy the sailboat, as it was not abandoned or derelict, had an identifiable owner, and did not pose a hazard to navigation or the environment.  Even if the sailboat was deemed to be abandoned or derelict, Mr. Hoefling alleged, the City and its officers were required to provide him adequate notice (such as placing a notice of dereliction on the vessel and informing him of the notice) and consider alternatives to immediate destruction, such as taking the sailboat to a compound or marking it off with reflective tape and broadcasting a notice to mariners.[1]

## B

The second amended complaint—which named the City, Officer Roque, and Sgt. Gonzalez as defendants—contained five claims.  Each of the claims was asserted against all of the defendants.

Count I, pursuant to § 1983, alleged substantive and procedural due process violations under the Fourteenth Amendment; Count II, also pursuant to § 1983, alleged an unreasonable search and seizure under the Fourth Amendment; Counts III and IV, sounding in admiralty, respectively alleged the intentional and negligent destruction of property; and Count V alleged an unconstitutional taking in violation

---

[1] Unlike the initial complaint, which attached the May code enforcement notice, and the first amended complaint, which attached several incident reports written by City marine patrol officers, the second amended complaint did not have any exhibits.

5

of the Florida and United States Constitutions.  Mr. Hoefling sought compensatory and punitive damages for the seizure and destruction of his sailboat.

The district court granted the defendants' Rule 12(b)(6) motion to dismiss the second amended complaint, *see Hoefling v. City of Miami*, 17 F.Supp.3d 1227 (S.D. Fla. 2014) (*Hoefling II*), and its order of dismissal is the subject of this appeal.  Our review, unless otherwise noted, is plenary.  *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

## II

The district court dismissed the complaint on some general grounds and some claim-specific grounds.  We discuss the general grounds first.

## A

The district court, quoting one of our decisions, applied a "heightened pleading" standard to Mr. Hoefling's § 1983 claims.  *See Hoefling II*, 17 F.Supp.3d at 1232 (quoting *Keating v. City of Miami*, 598 F.3d 753, 762–63 (11th Cir. 2010)).  As the defendants conceded at oral argument, this was incorrect.

We used to apply a heightened pleading standard in § 1983 cases in an effort to "eliminate nonmeritorious claims."  *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 309 (11th Cir. 1989).  In 1993, however, the Supreme Court held, in a municipal liability case under § 1983, that "it is impossible to square a 'heightened pleading standard' . . . with the liberal system of 'notice pleading' set

6

up by the Federal Rules." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). After *Leatherman*, we eliminated the heightened pleading standard in § 1983 cases not involving qualified immunity. *See, e.g.*, *Swann v. S. Health Partners, Inc.*, 388 F.3d 834, 837–38 (11th Cir. 2000).

Following the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), we got rid of heightened pleading altogether in § 1983 cases. We held that "it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints." *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010). It is true that *Keating*—the case cited by the district court—equated our former heightened pleading standard with the newer *Iqbal* standard, but we later ruled in *Randall* that this language in *Keating* was dicta. *See id.*at 707 n.2.

We expressly held in *Randall*, and reaffirm today, that "whatever requirements our heightened pleading standard once imposed have since been replaced by those of the *Twombly-Iqbal* plausibility standard . . . . [which] applies to *all* civil actions . . . ." *Id.* *See also Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) ("After . . . *Iqbal* . . . , which applied the *Twombly* pleading standard in a civil rights/qualified immunity context, there is no longer a 'heightened pleading' standard in 'cases governed by Rule 8(a)(2), including civil

7

rights [cases]' under § 1983.") (quoting *Randall*, 610 F.3d at 710) (alterations in original). Accordingly, the district court should not have placed a "heightened pleading" burden on Mr. Hoefling for his § 1983 claims.[2]

**B**

When he filed his initial complaint, Mr. Hoefling attached as an exhibit the code enforcement notice left on his sailboat on May 27, 2010. And in his first amended complaint, Mr. Hoefling attached as exhibits three City of Miami incident reports (one for May 27, 2010, one for August 20, 2010, and one for September 20, 2010). Accepting as true the assertions of City marine patrol officers contained in those reports, the district court had previously found that Mr. Hoefling had notice of the derelict state of his sailboat. *See Hoefling v. City of Miami*, 876 F.Supp.2d 1321, 1328–31 (S.D. Fla. 2012) (*Hoefling I*).

Although Mr. Hoefling did not attach the code enforcement notice or the incident reports as exhibits to his second amended complaint, the district court—at the defendants' urging—considered the contents of those reports in ruling on the motion to dismiss that complaint. Based in part on what the City marine patrol officers wrote in those reports, the district court again found that Mr. Hoefling was

---

[2] The district court did not have the benefit of *Saunders* when it dismissed Mr. Hoefling's second amended complaint. But *Randall*, which eliminated heightened pleading in all § 1983 cases, had already been decided. In any event, we cite to *Saunders* because we "appl[y] the law as it exists at the time of its review, not as it existed at the time the district court rendered its decision." *Bradford v. Bruno's, Inc.*, 94 F.3d 621, 623 (11th Cir. 1996) (citing *Gibson v. Berryhill*, 411 U.S. 564, 580–81 (1973)).

told that his sailboat was derelict prior to its removal, and accordingly dismissed the due process claims in Count I.  The district court also relied on what the reports said to conclude that the sailboat was in fact derelict.  Given that conclusion, the district court dismissed the Fourth Amendment claim in Count II and the takings claim in Count V.   And, relying in part on the reports to establish that the officers were acting within their lawful authority, the district court dismissed the maritime destruction of property claims in Counts III and IV. *See Hoefling II*, 17 F.Supp.3d at 1237–38, 1243–44.  This, too, was error.   Before we explain why, we take a moment to describe the incident reports relied upon by the district court.

The May 27 report, written by Officer Macias, indicated that Mr. Hoefling's sailboat "[was] derelict, in that it [was] left stored and abandoned in a substantially dismantled condition upon public state waters.  [It] ha[d] no motor, sails, helm or rudder for propulsion or steering."  D.E. 33 at 14.  In that same report, Officer Macias stated that he told Mr. Hoefling about the problems and advised him that the sailboat was subject to removal under Fla. Stat. § 823.11 if it was not brought into compliance with Florida law.  *Id.*

The August 20 report, written by Officer Roque, stated that Mr. Hoefling's sailboat, which was scheduled for "derelict vessel cleanup," was found "covered with garbage."  It also indicated that a "red inverter" was found onboard and "turned into [the] property [department] under the owner[']s name."  *Id.* at 10–11.

The September 20 report (which identifies Sgt. Gonzalez as the supervising officer and was written by Officer Macias) contained the following narrative: "On Friday[,] August 20, 2010[,] Officer Ricardo Roque #27435 observed vessel to still be in its derelict condition and had it removed from state waters and destroyed by a city contractor." *Id.* at 17.

The district court "summarily" rejected Mr. Hoefling's argument that it should not consider the reports which had been attached to the first amended complaint but omitted from the second amended complaint. *See Hoefling II*, 17 F.Supp.3d at 1232 n.6. Accepting as true the narrative in the May 27 report, the district court again found that Mr. Hoefling had "notice of the derelict condition of the vessel." *Id.* at 1230. *See also id.* at 1234, 1237–38. The district court thought Mr. Hoefling was "attempt[ing] to pull the wool over the [c]ourt's eyes by disavowing those exhibits" and "declining to attach them" to the second amended complaint, something the court considered "a transparent attempt to overcome [its] prior adverse finding." *Id.* at 1235 n.11.

A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls. *See, e.g.*, *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (citing cases). The classic example is when a plaintiff attaches a document to his

10

complaint but his allegations about what the document is or says contradict the document itself. *See, e.g.*, *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940) (letter in breach of contract action). But that general principle does not govern here.

As a matter of law, the second amended complaint filed by Mr. Hoefling "supersede[d] the former pleading[s]; the original pleading[s] [were] abandoned by the amendment, and [were] no longer a part of [Mr. Hoefling's] averments against his adversar[ies]." *Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1210, 1215 (11th Cir. 2006). So when Mr. Hoefling filed the second amended complaint, the first amended complaint (and its attached exhibits) became a legal nullity.

As *Dresdner Bank* explains, our cases do not permit a district court to consider, on a motion to dismiss, exhibits attached to an earlier complaint that a plaintiff has expressly disavowed or rejected as untrue in a subsequent amended complaint. In *Dresdner Bank*, for example, we held that, when a plaintiff amends its original complaint to make clear "it had rejected" a certain contract provision, it will not be bound by the terms of the contract simply because it had attached the contract to the original complaint. *Id.* And "[e]ven if [the] original complaint could be construed to affirm the proposed contract," the result would be the same because the original complaint "was wholly superseded by the amended complaint which proceeded under a different theory." *Id.*

11

*Dresden Bank* governs here.  In his second amended complaint, Mr. Hoefling expressly alleged that his sailboat was seaworthy and not derelict, as it had an intact hull, a mast, an engine, a rudder, working sails (which were stored in the cabin), and an anchor light.  Those allegations directly conflict with the assertions in Officer Macia's May 27 and September 20 reports that the sailboat did not have a motor, sails, or rudder.  Mr. Hoefling also specifically denied in the second amended complaint that he was given notice on May 27 that his vessel was derelict and/or at risk of being removed and destroyed.  According to the second amended complaint, Mr. Hoefling was cited that day only for not having a marine sanitary device and was told to get a better anchor light.  And, as the second amended complaint alleges, the code enforcement notice placed on the side of the sailboat did not have any violations checked off.

Mr. Hoefling did allege in his second amended complaint that Officer Macias gave him an "incorrect opinion" that the sailboat was derelict or at risk of being derelict, but viewing the allegations as a whole, and drawing reasonable inferences in Mr. Hoefling's favor, *see, e.g., Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1054 (11th Cir. 2015), that opinion did not amount to adequate notice of a violation which made the sailboat subject to removal and destruction under Florida law. At the very least, the allegations in the second amended complaint dispute Officer Macias' May 27 report that the sailboat was in a derelict state.

12

Moreover, that complaint does not admit (or give any credence to) the statement in the August 20 report that the sailboat was found covered with garbage.

Four months after the district court dismissed Mr. Hoefling's second amended complaint, we reviewed a case where a civil rights plaintiff attached police reports to his complaint in support of one claim, but expressly alleged that the reports were substantively false with regard to another claim. *See Saunders*, 766 F.3d at 1270. We held that when a "plaintiff attaches a police report to his complaint and alleges that it is false, . . . the contents of the report cannot be considered as true for purposes of ruling on a motion to dismiss." *Id.* "Otherwise officers sued under § 1983 could just attach police reports referenced in a civil rights complaint to their motions to dismiss and ask courts to consider the contents of those reports, even if they contradicted the allegations of the complaint." *Id.* We recognize, as we noted earlier, that the district court did not have the benefit of *Saunders* when it ruled. But under *Dresdner Bank* it should not have accepted as true the contents of the incident reports to find, when ruling on the motion to dismiss the second amended complaint, that Mr. Hoefling had notice that his sailboat was derelict or that the vessel was in fact derelict.

We also reject the defendants' argument that the doctrine of "judicial estoppel" prevents Mr. Hoefling from filing a second amended complaint that rejected the information contained in the reports he attached as exhibits to the

13

earlier complaints.    At a minimum, judicial estoppel requires a party's later position to be contradictory or "clearly inconsistent" from an earlier one. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002).    From his initial complaint forward, Mr. Hoefling has always alleged that his sailboat was not abandoned or derelict, and that the City's marine patrol officers failed to give him adequate notice prior to its seizure and destruction.    He has never adopted the contents of the incident reports as true, and therefore it is wrong for the defendants to argue that the second amended complaint "expressly and implicitly adopted" as true the statements in the incident reports.    *See* Br. for Appellees at 23.    The doctrine of judicial estoppel just does not apply.

So, to the extent that the district court dismissed the federal constitutional claims in Counts I, II, and V, and the maritime claims in  Counts III and IV, based on the contents of the incident reports, it erred.    On remand the district court should assess the sufficiency of the procedural due process, search and seizure, and takings claims without reliance on the disputed portions of the incident reports.    It should assume, as Mr. Hoefling has alleged, that the sailboat was not derelict, and that he was never given adequate notice that it was derelict and subject to removal and destruction.

14

### III

We now turn to some of the district court's claim-specific grounds for dismissal.

### A

As a municipality, the City cannot be held vicariously liable under § 1983 for constitutional violations committed by its officers. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 693–94 (1978). Mr. Hoefling must ultimately prove that the City had a policy, custom, or practice that caused the deprivation. *See e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir. 2015); *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

With respect to the procedural due process claim in Count I and the Fourth Amendment claim in Count II, the district court concluded that the second amended complaint was insufficient as to municipal liability because Mr. Hoefling failed to identify the City official who acted as the final policymaker. *See Hoefling II*, 17 F.Supp.3d at 1239. In our view, the district court was mistaken.

*Monell*, the Supreme Court has explained, is a "case about responsibility," and is meant to limit § 1983 liability to "acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnatti*, 475 U.S. 469, 478, 480 (1986). There are, however, several different ways of establishing municipal

15

liability under § 1983. A municipality can be liable for an official policy enacted by its legislative body (e.g., an ordinance or resolution passed by a city council). *See Monell*, 436 U.S. at 661, 694–95; *McCusik v. City of Melbourne*, 96 F.3d 478, 483 (11th Cir. 1996). Municipal liability may also attach if final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure. *See Bd. of Cty. Commissioners v. Brown*, 520 U.S. 397, 403–04 (1997); *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 n. 11 (11th Cir. 1991). And a municipality can be held liable "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002). So not all theories of municipal liability under § 1983 require (or depend on) a single final policymaker.

The Supreme Court has spoken of establishing a municipality's final policymaker in evidentiary terms. For example, it has said that "*proof* that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federal protected right necessarily establishes the municipality acted culpably." *Brown*, 520 U.S. 397 at 405 (emphasis added). We too have discussed the "evidence" concerning the decision of a final policymaker. *See, e.g.*, *Carter v. City of Melbourne*, 731 F.3d 1161, 1167 (11th Cir. 2013);

16

*Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006). *Cf. Mandel v. Doe*, 888 F.2d 783, 792–93 (11th Cir. 1989) ("identification of the policymaker may often involve fact-sensitive inquiries"). We therefore believe that identifying and proving that a final policymaker acted on behalf of a municipality is "an evidentiary standard, and not a pleading requirement." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002). *See Twombly*, 550 U.S. at 570 (distinguishing but not overruling *Swierkiewicz* on this point). Although Mr. Hoefling may ultimately have to identify (and provide proof concerning) a single final policymaker in order to survive summary judgment or prevail at trial, *see, e.g.*, *Grech v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003), we do not think that he had to name that person in his complaint in order to survive a Rule 12(b)(6) motion. All he needed to do was allege a policy, practice, or custom of the City which caused the seizure and destruction of his sailboat. And that, as we detail below, he did.

**B**

The "touchstone of [a] § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of civil rights protected by the Constitution." *Monell*, 436 U.S. at 690. Given that a complaint need only state enough facts to "state a claim for relief that is plausible on its face," *Twombly*, 550 U.S. at 570, we conclude that the second amended complaint

17

sufficiently pled a municipal liability claim for the alleged procedural due process and Fourth Amendment violations.

In addition to what he pled concerning the seizure and destruction of his own sailboat, Mr. Hoefling also alleged the following. First, on August 20, 2010, while out of town, Mr. Hoefling received a call from a friend "notifying him that the police were taking boats." And, in fact, on his return, he discovered that his own sailboat had been "unlawfully seized." Second, Mr. Hoefling alleged that "local mariners" told him, and that he was "independently aware, that others have fallen victim to similar conduct as a result of the City['s] and [the marine patrol officers'] failure to adhere to law and appropriate procedures regarding the investigation and destruction of potentially derelict vessels." Third, Mr. Hoefling alleged that the City refers to this "systematic roundup and destruction of ugly boats in its waters" as a "cleanup" program. Based on these allegations, Mr. Hoefling alleged that the City had a "policy, custom, and/or practice" of "failing to abide by" the state laws, regulations, and procedures governing the "investigation and . . . removal of derelict vessels located in state waters." Furthermore, he alleged that the defendants did "not follow established law and procedures intended to safeguard against the unlawful destruction of private property[,] . . . instead choosing to remove and destroy [his] property without due process. In sum, the City and its

18

marine patrol officers, "as a matter of policy, custom, and/or practice, ignored [his] fundamental rights, as well as the fundamental rights of other vessel owners."

These are not the sort of "naked allegations" we found wanting in *Weiland*, 792 F.3d at 1329–30 (brackets and quotation marks deleted).   Under *Leatherman*, *Twombly*, and *Iqbal*, Mr. Hoefling's allegations were sufficient to state a facially plausible municipal liability claim because they permit "the reasonable inference that [the City] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  *See Hailey v. City of Boston*, 657 F.3d 39, 51–52 (1st Cir. 2011) (applying *Twombly* and *Iqbal* and holding that municipal liability claim was sufficiently pled).

The case cited by the district court, *Grech*, 335 F.3d at 1329, does not call for a contrary result, as it was in a summary judgment posture, and at that stage of a case the plaintiff cannot merely rely on the allegations in his complaint. Significantly, the defendants cannot point to any post-*Leatherman* Supreme Court or circuit cases—and we have not been able to locate any ourselves—holding that a complaint asserting a § 1983 municipal liability claim must, as a Rule 8(a) pleading matter, always specifically identify the municipality's final policymaker by name.

## C

In our view, Mr. Hoefling also sufficiently stated a claim for an unconstitutional seizure under the Fourth Amendment.  In *Soldal v. Cook County*,

506 U.S. 56, 60–61 (1992), the Supreme Court unanimously held that a landlord's removal and towing of a mobile home, in violation of state law and with the assistance of sheriff's deputies, constituted a seizure under the Fourth Amendment: "As a result of the state action in this case, the Soldals' domicile was not only seized, it was literally carried away, giving new meaning to the term 'mobile home.' We fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure involving the protection of the Fourth Amendment." *Id.* at 61. In so ruling, the Supreme Court rejected the notion that "the Fourth Amendment protects against unreasonable seizures of property only when privacy or liberty is also implicated." *Id.* at 65. Here the defendants' alleged removal and destruction of Mr. Hoefling's sailboat, under the circumstances described in the second amended complaint, similarly constitutes a seizure under the Fourth Amendment. Mr. Hoefling alleged that his sailboat was not derelict, that he was not given adequate notice by the City that it was derelict and therefore subject to removal, and that the vessel was removed and destroyed by the City pursuant to a systematic "cleanup" program to get rid of ugly boats.

The next question, of course, is whether the seizure was constitutionally reasonable, and that question requires a "careful balancing of governmental and private interests." *Soldal*, 506 U.S. at 71 (internal quotation marks and citation

omitted).  The district court, again relying on the contents of the incident reports, concluded that Officer Roque and Sgt. Gonzalez were entitled to qualified immunity on the seizure claim because the sailboat was derelict and because Mr. Hoefling had been given notice of its derelict state and told to remove the vessel or bring it into compliance. *See Hoefling II*, 17 F.Supp.3d at 1230–31, 1233–34.  But, as we have already explained, it was not appropriate to consider the reports for the truth of the statements contained in them in assessing the sufficiency of Mr. Hoefling's second amended complaint.

The Supreme Court has instructed that, in assessing the two prongs of the qualified immunity standard at the summary judgment stage, the evidence must be viewed in the light most favorable to the plaintiff.  *See Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (reversing grant of qualified immunity because court resolved factual disputes and inferences against the plaintiff: "Our qualified immunity cases illustrate the importance of drawing inferences in favor the non-movant, even when, as here, the court decides only the clearly-established prong of the standard.").  The same general principle, of course, applies when qualified immunity is raised at the motion to dismiss stage.  *See St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1338 (11th Cir. 2002) (explaining that, when "reviewing [a] grant of qualified immunity by the district court . . . on a Rule 12(b)(6) motion to dismiss, we must construct our own firewall between the facts pleaded in the

21

complaint and any evidence, construing the complaint in favor of the plaintiff[ ]").

On remand, the district court should address qualified immunity anew, crediting the factual allegations in the second amended complaint and without reference to the disputed contents of the incident reports.

## D

We agree with the district court that Mr. Hoefling did not state a substantive due process claim in his second amended complaint. That claim, therefore, was properly dismissed.

The substantive component of the Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (internal quotation marks and citation omitted). It is "state conduct [which] can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1074 (11th Cir. 2000) (brackets, internal quotation marks, and citation omitted). To state a substantive due process claim, a plaintiff must allege (1) a deprivation of a constitutionally protected interest, and (2) that "the deprivation was the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation." *Executive 100, Inc. v. Martin Cnty.*, 922 F.2d 1536, 1541 (11th Cir. 1991). "A deprivation is of

constitutional stature if it is undertaken for improper motive and by means that were pretextual, arbitrary and capricious, and without rational basis." *Id. See also Reserve, Ltd. v. Town of Longboat Key*, 17 F.3d 1374, 1379 (11th Cir. 1994) (same).

Mr. Hoefling alleges that the City violated his substantive due process rights because it has a marine patrol "cleanup program" that identifies boats it considers ugly, and then seizes and destroys those boats without giving their owners notice or an opportunity to contest their removal or destruction. Although the Supreme Court in *Sodal* did not address whether the removal and towing of the mobile home could give rise to both a Fourth Amendment seizure claim and a Fourteenth Amendment substantive due process claim, *see* 560 U.S. at 70, we have since held that where law enforcement officials unlawfully seize a person's home, any constitutional protection that its owner may have comes from the Fourth, and not the Fourteenth, Amendment. *See Tinney v. Shores*, 77 F.3d 378, 381 (11th Cir. 1996) (holding that the Supreme Court, in *Sodal* and other cases, "foreclosed" substantive due process claims under such circumstances). We are bound by *Tinney*, and therefore hold that Mr. Hoefling—who has a Fourth Amendment seizure claim available to him—cannot also claim a violation of substantive due process.

## IV

We think it is best to allow the district court to re-examine the remaining claims and the qualified immunity issues without a heightened pleading standard and without accepting as true the contents of the incident reports.  Having said that, we have some suggestions for the district court on remand.

With respect to the procedural due process claim, the district court should analyze whether this is one of those situations where the existence of a post-deprivation remedy is sufficient, as in *Tinney*, 77 F.3d at 380, or whether Mr. Hoefling has sufficiently alleged that the destruction of his sailboat was pursuant to a policy or practice of the City (i.e., the alleged "cleanup" program) such that pre-deprivation notice was feasible and required under cases like *Hudson v. Palmer*, 468 U.S. 517, 532 (1984) (explaining that, "where the property deprivation is effected pursuant to an established state procedure," a post-deprivation state remedy cannot satisfy due process), and *Rittenhouse v. DeKalb Cnty.*, 764 F.2d 1451, 1455 (11th Cir. 1985) (holding that the focus on the adequacy of post-deprivation remedies—due to the random, unauthorized act of an employee—does not apply "where a deprivation occurs pursuant to an established state procedure," because in those circumstances, a "predeprivation process is ordinarily feasible"). The district court should also consider the impact, if any, of *Grayden v. Rhodes*, 345 F.3d 1225, 1237–44 (11th Cir. 2003), on the notice issue.

As for the federal and state takings claims, the district court should take into account the Supreme Court's recent decision in *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2426 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home."). The district court may also need to address whether the ripeness principle set forth in *Williamson Cnty. Reg'l Planning Com'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985), a regulatory takings case, applies to a case involving a physical taking. A number of circuits have held that a plaintiff alleging a physical taking must seek compensation through available state remedies before filing suit under § 1983. *See, e.g.*, *Kurtz v. Verizon N.Y., Inc.*, 758 F.3d 506, 513–14 (2d Cir. 2014); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 958 (7th Cir. 2004).

In sum, we affirm the district court's dismissal of Mr. Hoefling's substantive due process claim. We reverse the district court's dismissal of the other claims and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**

25