**Michael James BROWN, Plaintiff,**

**v.**

**Charles Shelton THOMPSON and the City of Whitesburg, Defendants.**

**CIVIL ACTION FILE No. 3:15–cv–158–TCB**

United States District Court, N.D. Georgia, Newnan Division.

Signed 03/20/2017

---

8. See supra at p. 1328, n. 6

**1334**

Desiree D. Duke, Timothy A. Heath, The Duke Law Firm, LLC, Carrollton, GA, for Plaintiff.

Harvey Scott Gray, Matthew Albert Ericksen, Gray Rust St. Amand Moffett & Brieske, Atlanta, GA, for Defendants.

## ORDER

Timothy C. Batten, Sr., United States District Judge

This is a civil rights case filed pursuant to 42 U.S.C. § 1983 by Plaintiff Michael James Brown against Defendants the City of Whitesburg and Charles Shelton Thompson. Defendants have moved for summary judgment [23], and Brown has moved for leave to amend his complaint to allege that he provided timely ante-litem notice as required by O.C.G.A. § 36–33–5.[1]

### I. Factual Background

On the morning of September 6, 2013, Thompson—who was on duty as a police officer with the City of Whitesburg police department—received a "be on the lookout" notification or "BOLO" regarding a runaway thirteen-year-old named Jesse Brown ("Jesse"). The BOLO advised that Jesse had last been seen with his father, Plaintiff Michael Brown, who did not have legal custody of Jesse and was believed to be living at 10 Aycock Street in Whitesburg. The BOLO also included a description of Jesse's appearance and information about the make, model, and tag number of Brown's truck.

Thompson traveled to Aycock Street and saw Brown's truck parked in a carport next to a house.[2] When Thompson approached the truck, he saw a juvenile inside the truck matching Jesse's description. Thompson spoke to the boy, who confirmed that he was Jesse. Jesse advised that he did not feel well and that his father had picked him up from school. Thompson told Brown—who was inside the house and undressed—to get dressed and come outside so they could speak.

Brown complied, and he and Thompson spoke outside the home, where Thompson told Brown that he needed to take Jesse into custody. After securing Jesse in the back of his patrol car, Thompson—who had been informed by dispatch that the detective working Jesse's case was in the process of taking out warrants for Brown's arrest[3]—remarked to Brown that they needed to discuss the "possible warrants" for Brown out of Fayette County. Brown turned and began walking or running back

---

1. As there is no dispute that Brown did in fact provide ante-litem notice to the City and the parties have fully briefed whether that notice was timely, the Court will grant Brown's motion for leave to amend his complaint but will excuse Defendants from the obligation of responding to the amended complaint.

2. The house, which Brown had purchased just days earlier, was in very poor condition, although Brown contends that it was "manageable" and he intended to live there while remodeling it. [25–7] at ¶¶ 9–12.

3. There is no dispute that neither the dispatcher nor Thompson was told the specific crimes with which the detective intended to charge Brown. Brown asserts that there is "absolutely no possible way that Thompson

could have known what the warrants were for" and that "Thompson could not possibly conclude that he had probable cause as he found Jesse outside asleep in the truck while Brown was sleeping inside the home." According to Thompson, his communications with the dispatcher and knowledge of the case were sufficient to allow him to conclude that the detective would obtain arrest warrants charging Brown with kidnapping, interfering with custody, and/or related charges. He also concluded that he had probable cause to arrest Brown for, at a minimum, interference with child custody in violation of O.C.G.A. § 16–5–45(b)(1). A first or second violation of that statute is a misdemeanor, while third or subsequent violations are punishable as felonies. O.C.G.A. § 16–5–45(b)(2)(C).

to the house. When he realized that Thompson was following him, he darted into the bedroom and shut the door behind him.

Thompson ordered Brown to come out, and Brown replied "I ain't coming out, mother fucker." Thompson continued to yell for Brown to come out and attempted to open the door, but Brown was holding it shut. Thompson then struck the door, and in so doing apparently caused a twelve-gauge shotgun that had been leaning against the wall of the bedroom to fall over and discharge.[4] The gun discharged in the opposite direction of the door (and thus Thompson), and neither man was struck by the shot that was fired. Thompson heard the loud and distinct sound of the gun discharging, however, and asserts that he believed Brown was armed and trying to shoot him.[5] Thompson drew his firearm and discharged several rounds toward the door, striking Brown in the legs. Thompson then ran outside, advised dispatch that shots had been fired, and requested backup and an ambulance.

Brown was removed from the house on a stretcher, was rushed by helicopter to Atlanta Medical Center for surgery, and remained hospitalized for twenty days. Thompson was driven to the police department, where he met with a Georgia Bureau of Investigation ("GBI") agent and voluntarily answered questions and provided an oral statement about what had transpired. Ultimately, the Coweta Judicial Circuit District Attorney concluded that Thompson's use of force was reasonable and that a criminal prosecution was not warranted. Brown, however, was indicted for numerous felony charges arising from the September 6, 2013 incident. Thompson was not involved in the decision to bring those charges.

Brown has filed this suit against Thompson and the City, asserting claims for negligence, respondeat superior, failure to properly train, assault and battery, and "violation of civil rights." He seeks actual and punitive damages as well as an award of attorneys' fees. Defendants now move for summary judgment on all claims.

## II. Analysis

### A. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, "a court may not weigh conflicting evidence or make credibility determinations of its own." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011). Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

### B. Brown's § 1983 Claim

Count five of Brown's complaint is captioned "42 U.S.C. § 1983—Violation of Civil Rights," and apart from one paragraph incorporating by reference the preceding

---

4. Despite being a convicted felon, Brown describes himself as an "avid gun collector," and he states that he "usually keep[s his] guns loaded."

5. Brown contends "this is difficult to believe as there was not a hole in the door or the wall between himself and Thompson," but he concedes that it is possible that someone in Thompson's position to believe that Brown might have been trying to shoot at him.

allegations in the complaint, the entire substance of this count is as follows:

> [Defendants], acting under color of law, did violate the civil rights, privileges, and immunities of Plaintiff, Michael James Brown [by] falsely representing the existence of an arrest warrant for Plaintiff, by illegally entering his home without authority to do so and by using deadly force against him in violation of 42 U.S.C. § 1983 and the United States Constitution.

[1–1] at ¶ 38.

■ "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 & n.3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Defendants correctly construe count five as asserting a claim for excessive force in violation of Brown's Fourth Amendment rights.[6] Specifically, Brown contends that Thompson violated his Fourth Amendment rights when Thompson illegally entered Brown's residence and again when Thompson used excessive force against Brown. Defendants contend that this claim fails on the merits, that Thompson is entitled to qualified immunity, and that Brown has failed to establish the requirements for municipal liability in § 1983 cases.

6. Insofar as Brown asserts that his § 1983 claim could also be read to assert a claim for violation of his substantive due process rights under the Fourteenth Amendment, *see* [25] at 6, the Court will grant summary judgment to Defendants on that claim. *Cantrell v. White*, 178 F.Supp.3d 1308, 1314 n.39 (N.D. Ga. 2016) (explaining that all excessive force claims are to be analyzed under the Fourth Amendment and granting summary judgment

### 1. Warrantless Entry

■ "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

There is no dispute that Thompson followed Brown into the Aycock Street structure without a warrant to do so, but Defendants argue that Brown's warrantless-entry claim fails because "the dilapidated structure where plaintiff ran in no manner appeared to be a residence," [23–1] at 9, and because exigent circumstances existed that justified a warrantless entry.

■ The Fourth Amendment's protections of a person's home do not apply to abandoned property. *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) ("A search of abandoned property 'does not implicate the Fourth Amendment, for any expectation of privacy in the item search is forfeited upon its abandonment.'") (quoting *United States v. James*, 534 F.3d 868, 873 (8th Cir. 2008)). "A police officer's warrantless entry into a house that *appears* to be abandoned, but is not actually

on any Fourteenth Amendment claims) (citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("[A]*ll* claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment ... rather than under a 'substantive due process' approach.")).

abandoned, does not violate the Fourth Amendment when [the officer] act[s] on an objectively reasonable mistake of fact." *Olvera v. City of Modesto*, 38 F.Supp.3d 1162, 1172 (E.D. Cal. 2014); *accord McKenney*, 635 F.3d at 358–59.

The undisputed evidence shows that the structure on Aycock Street where Thompson encountered Brown and Jesse was dilapidated. The structure had bare walls and floors, minimal furniture and personal effects,[7] an oven without a door, and a front door that had a lockbox on it and a piece of plywood covering the space where a window would be. [23–3] at 15–18. Brown had just purchased the home for approximately $12,000 and intended to remodel it, and even he concedes that the house was unfit for Jesse to sleep in because it contained mold. [25–7] at ¶ 20.

But whatever condition the structure was in, Brown's affidavit testimony that he told Thompson—*before* Thompson ever entered the home—that he "had been living [t]here while [he] was fixing it up" stands undisputed. *Id.* at ¶ 27. In addition, dispatch had informed Thompson that Brown was "possibly *living* at ... 10 Aycock Street in Whitesburg," [25–2] at 5 (emphasis added), and when he arrived he found Brown's vehicle parked under the carport and Brown undressed inside the structure, [23–3] at ¶¶ 10, 14. Thus, viewing the evidence and all reasonable inferences in the light most favorable to Brown, the Court cannot conclude that it was objectively reasonable for Thompson to believe that it was not Brown's residence. *Cf. McKenney*, 635 F.3d at 359 (officer reasonably concluded property was abandoned where, among other factors, nobody responded

when they knocked on the door, the doors were left open, there was no indication the house had power, and there were no vehicles parked outside); *United States v. Knepper*, 256 Fed.Appx. 982, 984 (9th Cir. 2007) (officer's belief that house was abandoned was objectively reasonable where it was based in part on "former landlord's credible account that Knepper had vacated the premises"); *Olvera*, 38 F.Supp.3d at 1173 (belief that building was abandoned was reasonable where officer had already searched three other buildings in same complex and found them to be abandoned and where no response was received to officer's announcement before entering).

Accordingly, Thompson's decision to follow Brown into the Aycock Street home is presumptively unreasonable. "However, where probable cause exists and exigent circumstances make it impossible or impractical to obtain a warrant, the warrantless entry may be excused." *United States v. Louisuis*, No. 2:06–cr–4–FtM–99SPC, 2006 WL 2193820, at *8 (M.D. Fla. Aug. 2, 2006) (citing *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) ("A warrantless search [of a home] is allowed, however, where both probable cause and exigent circumstances exist.")).[8] An officer claiming the exigent-circumstances exception "bears the burden of proving that his conduct was justified." *McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007). The Court must "determine whether exigent circumstances existed by looking at the totality of the circumstances." *Hill v. Orange Cty. Sheriff*, 666 Fed.Appx. 836, 839 (11th Cir. 2016).

Exigent circumstances exist "when there is compelling need for official action

---

7. The photographs of the front room and the kitchen show no furniture at all, but Brown asserts in his affidavit that he and Jesse had "move[d] some artifacts and furniture into the house, including a bed." [25–7] at ¶ 17.

8. In this case, there is no dispute that Thompson had probable cause to believe that Brown had committed a crime, although the parties disagree as to whether he had probable cause to believe that Brown had committed a felony or only a misdemeanor.

and no time to secure a warrant," *Bashir v. Rockdale County*, 445 F.3d 1323, 1328 (11th Cir. 2006), or in other words, when the situation is such that "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action," *McClish*, 483 F.3d at 1240 (internal punctuation omitted). "Thus, for example, the courts have upheld exigent circumstances entries to break up a violent fight, to prevent the destruction of evidence, to put out a fire in a burning building, to pursue a fleeing suspect, to rescue a kidnapped infant, and to attend to a stabbing victim." *Id.* at 1240–41 (internal citations omitted); *see also Bashir*, 445 F.3d at 1328 ("Situations in which exigent circumstances exist include: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit.") (internal punctuation omitted).

■ Defendants argue that exigent circumstances justified Thompson's entry into the home because Thompson was in hot pursuit of a fleeing suspect.[9] Brown urges the Court to limit the "hot pursuit" doctrine to cases involving persons suspected of committing felonies and hold that because Thompson could not have had probable cause to believe Brown committed a felony—a proposition with which Defendants adamantly disagree—he cannot avail himself of any "fleeing felon" defense. But even if the Court were to accept Brown's position on the facts and the law, Defendants would be entitled to summary judgment on this claim.

On November 4, 2013, just two months after the incident giving rise to this case

took place, the Supreme Court issued its opinion in *Stanton v. Sims*, —— U.S. ——, 134 S.Ct. 3, 7, 187 L.Ed.2d 341 (2013), holding that a police officer was entitled to qualified immunity after making a warrantless entry into a fenced yard while in pursuit of a suspect whom he had probable cause to believe had committed a crime punishable under state law as a misdemeanor. The Supreme Court noted that "federal and state courts nationwide are sharply divided on the question whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit of that suspect." *Id.* at 5. The Court declined to resolve this divide, expressing no view on whether the officer's conduct was in fact constitutional. *Id.* at 7. Regardless of the actual constitutionality of the conduct at issue, the Court held, the law was not "clearly established" and thus the officer was entitled to qualified immunity. *Id.*; *see generally Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (noting that qualified immunity protects a public official whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" at the time of the violation).

■ In September 2013, even if Thompson possessed probable cause to believe that Brown had committed only a misdemeanor, the law of exigent circumstances based on hot pursuit of a suspect believed to have committed a misdemeanor was not "clearly established." *Kingsland*, 382 F.3d at 1231. Thompson is therefore entitled to qualified immunity from any such claim.[10] *See Rutledge v. Millsap*, No.

---

**9.** "A hot pursuit means some sort of chase, but it need not be an extended hue and cry in and about the public streets." *United States v. Fuller*, 572 Fed.Appx. 819, 821 (11th Cir. 2014) (internal punctuation omitted). The Court concludes that Thompson was engaged in "some sort of chase" of Brown, even

though that chase consisted only of Thompson following Brown as he retreated on foot into his home.

**10.** "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority."

4:12-cv-146-HLM, 2015 WL 12866455, at *19 (N.D. Ga. July 30, 2015) (granting summary judgment on qualified immunity grounds to officer who pursued misdemeanor suspect onto curtilage of suspect's home, noting that the events in question took place prior to the Supreme Court's decision in *Stanton* and that decision highlighted the lack of clarity in the law at the time).[11]

■■■ Brown's § 1983 claim against the City of Whitesburg fares no better to the extent it is premised on Thompson's warrantless entry into Brown's home. Even if it were shown that Thompson's conduct violated Brown's Fourth Amendment rights, "[a]s a municipality, the City cannot be held vicariously liable under § 1983 for constitutional violations committed by its officers." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). Instead, a municipality is liable under § 1983 and *Monell [v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)] only where it "had a policy, custom, or practice that caused the deprivation" complained of. *Hoefling*, 811 F.3d at 1279.

Brown relies on "Standard 4.1 of the City of Whitesburg Police Department Standards Manual[,] which is the policy regarding search and seizure without a warrant," [25] at 19], as amounting to such a policy, custom, or practice, but the Court is unpersuaded. That policy declares that officers must "limit search without a search warrant to the clearly defined ex-ceptions to the requirement that a search warrant be obtained," expressly including "hot pursuit." [25–3] at 46. Thus, Brown's argument is, in essence, that the City failed to properly train its police officers about the proper procedures governing warrantless searches and seizures.

■■■ "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To establish deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Such knowledge on the city's part may be established by showing, for example, "a history of widespread prior abuse by [Sheriff's] Department personnel that would have put the sheriff on notice of the need for improved training or supervision." *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990). Brown points to no such evidence.

The mere fact that the lone written policy on which Brown relies does not explain the nuances of Fourth Amendment law does not evince a deliberate indifference by the City to the rights of its citizens. In the absence of such deliberate indifference,

*Cottone v. Jenne*, 326 F.3d 1352, 1357–58 (11th Cir. 2003). Although Brown suggests otherwise, *see* [25] at 17–18, the Court readily concludes that Thompson's conduct on the date in question was discretionary in nature. *See Miree v. United States*, 490 F.Supp. 768, 772–73 (N.D. Ga. 1980) (explaining that "[a] discretionary act is ... one which is the result of personal discretion or judgment," while "[a] ministerial act ... requires merely the execution of a specific duty arising from fixed or designated facts").

11. Brown's argument that a reasonable jury could find that Thompson acted with malice sufficient to overcome a claim of qualified immunity is unpersuasive. [25] at 18. Brown cites to no case law in support of this argument, and the Court has located no cases finding malice on facts comparable to those of the case at hand.

the City is entitled to summary judgment on Brown's warrantless-entry claim because any constitutional violation cannot be said to be the product of a City "policy, custom, or practice." *Hoefling*, 811 F.3d at 1279. The Court will therefore grant summary judgment to both Defendants on Brown's warrantless-entry claim.

#### 2. Excessive Force

■ To prevail on a Fourth Amendment claim of excessive force,[12] a plaintiff must show that a seizure occurred and that the force used to effect the seizure was unreasonable. *Troupe v. Sarasota County*, 419 F.3d 1160, 1166 (11th Cir. 2005). "When assessing an excessive force claim, the Court must pay 'careful attention to the facts and circumstances of the case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Cantrell v. White*, 178 F.Supp.3d 1308, 1315 (N.D. Ga. 2016) (quoting *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) (internal punctuation omitted); *see also Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008) (factors relevant to whether a use of force was objectively reasonable include the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in good faith or maliciously and sadistically).

■ "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Thus, the Court's analysis must " 'embody allowance for the fact that police officers are often forced to make split-

second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Cantrell*, 178 F.Supp.3d at 1315 (quoting *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865).

■ Brown's arguments against summary judgment on this claim boil down to a single proposition: after Brown's gun discharged behind the closed bedroom door, Thompson should have realized—and according to Brown, a reasonable officer in Thompson's position would have realized—that there were no bullet holes in the door and from that concluded that there was no need to respond with deadly force. But this argument employs precisely the type of "20/20 vision of hindsight" that the Eleventh Circuit has cautioned against. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

The undisputed record evidence shows that after Thompson referenced arrest warrants for Brown, Brown turned around and retreated into his bedroom, slamming the door and using his body weight to keep it shut. Thompson followed him, and the two men were alone inside the building. When Thompson instructed Brown to come out of the bedroom, Brown refused and yelled an obscenity at Thompson. Moments later, Thompson heard a gunshot from behind the closed door. He drew his firearm and discharged several rounds through the door, hitting Brown in the legs.

These undisputed facts reflect precisely the type of "split-second judgments" made under "tense" and "uncertain" circumstances that the Supreme Court spoke of in *Graham*. In an attempt to evade arrest, Brown locked himself into a room, refused to obey Thompson's orders to come out, and called Thompson a "mother fucker," all in the moments just before Thompson

---

12. As noted above, because Brown was actually shot, his excessive force claim is analyzed under the Fourth Amendment, not the Four-

teenth Amendment. *Carr v. Tatangelo*, 338 F.3d 1259, 1267 (11th Cir. 2003).

heard a shotgun discharge from inside the room. Brown asserts that the loaded gun had been leaning against the door and discharged only after falling over as the result of Thompson's attempts to gain entry into the bedroom. But there is no way Thompson could have known that the gun accidentally discharged. Thompson, who was alone inside the house with Brown, responded by fighting what he perceived to be fire with fire, and in so doing, he struck Brown in the legs. The only facts Brown relies on to demonstrate that Thompson acted maliciously is the inference that Thompson would have been angered by the expletive Brown called him. Even if true, that fact is insufficient to tip the scales in Brown's favor.

As unfortunate as the situation that played out on September 6, 2013 was, when the Court applies the factors set forth in *Cantrell* and *Hadley*, it is led to the inescapable conclusion that "an objectively reasonable officer in the same situation [as Thompson] could have believed that the force used was not excessive." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002); *see also Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (noting that an officer is entitled to qualified immunity if he reasonably believes the use of force was reasonable, "even if that belief was mistaken").[13] Thus, Thompson is entitled to qualified immunity as to this claim also.

■ In addition, even if Thompson did use excessive force against Brown, Brown has failed to articulate any basis consistent with *Monell* for holding the City liable that violation. Accordingly, both Defendants are entitled to summary judgment on Brown's Fourth Amendment excessive force claim.

## C. Brown's State–Law Claims

■ Brown also asserts state-law claims against Defendants for negligence, failure to train, and assault and battery. "The doctrine of official immunity offers public officers and employees limited protection from suit in their personal capacity." *Tisdale v. Gravitt*, 51 F.Supp.3d 1378, 1398 (N.D. Ga. 2014). "[A]n officer may be personally liable if in the performance of a ministerial duty ... he acts with negligence, actual malice or an intent to injure, [but] an officer may only be liable for the performance of a discretionary function if he acts with actual malice or an intent to injure." *Id.* at 1398–99.

■ The Court readily concludes that the conduct complained of occurred in the exercise of Thompson's discretionary functions. *See generally Payne v. DeKalb County*, 414 F.Supp.2d 1158, 1170–71 (N.D. Ga. 2004). Thus, Thompson is shielded from liability unless Brown can show that Thompson acted with malice or an intent to cause injury, which is "a demanding standard." *Felio v. Hyatt*, 639 Fed. Appx. 604, 611–12 (11th Cir. 2016). And as discussed above in connection with Thompson's entitlement to qualified immunity, Brown has made no such showing here.

■ Turning to Brown's state-law claims against the City of Whitesburg, the Court finds that Brown's ante-litem notice was timely.[14] Nevertheless, based upon the

---

13. Indeed, during his deposition, Brown conceded the possibility that someone in Thompson's position could have thought that he was being shot at by the person on the other side of the door. [23–4] at 95–96.

14. O.C.G.A. § 36-33-5(b) requires that ante-litem notice be provided "within six months of the happening of the event upon which a claim against a municipal corporation is predicated ...." There is no dispute that Brown's claims arose on September 6, 2013 but that he did not deliver his ante-litem notice until April 1, 2014. However, that six-month timeframe is subject to tolling when the would-be plaintiff is "legally incompetent

undisputed evidence in this case, there is no basis upon which to impose liability against the City for Brown's claims of negligence, assault and battery, and failure to train. Indeed, although Brown argues the timeliness of his ante-litem notice, he does not address the merits of his state-law claims against the City. *See* [25] at 21–22. Thus, the Court will grant summary judgment to both Defendants on these claims.

Finally, because Brown's claims for punitive damages and attorneys' fees are necessarily derivative of his substantive claims, which the Court has found to be meritless, Defendants are entitled to summary judgment on those claims as well.

### III.  Conclusion

For the foregoing reasons, Plaintiff's motion for leave to amend [24] is granted, and the Clerk is directed to docket the document attached to Plaintiff's motion [24–1] as a supplement to Plaintiff's complaint [1–1]. Defendants are excused from the obligation to respond to the amended complaint. Defendants' motion for summary judgment [23] is granted, and the Clerk is directed to close this case.

IT IS SO ORDERED this 20th day of March, 2017.

because of intellectual disability or mental illness." O.C.G.A. § 9–3–90(a); *Lawson v. Glover*, 957 F.2d 801, 805 (11th Cir. 1987) (noting that § 9–3–90 applies to tolling of ante-litem notice period as well). The lone—and therefore uncontradicted—record evidence regarding Brown's condition after the shooting is contained in his affidavit, where he asserts that he remained heavily sedated and medicated, emotionally unstable, unable to think clearly, and otherwise "both mentally and physically disabled" until some point after October 1, 2013, exactly six months before he served his ante-litem notice. [25–7] at ¶¶ 45–50. Thus, the Court declines to grant summary judgment to Defendants on the ground that Brown's ante-litem notice was untimely.